349 F.3d 765
 Clinton W. ODOM, Plaintiff-Appellant,
v.
SOUTH CAROLINA DEPARTMENT OF CORRECTIONS; Doug Catoe; D.J. Evans; P. Powell; W. Taylor; J. Griffin; S. Johnson; R. Chavis; South Carolina Department of Corrections Medical Facility; Nurse Walters; Nathaniel Hughes, Defendants-Appellees.
 No. 02-7086.
 United States Court of Appeals, Fourth Circuit.
 Argued: May 7, 2003.
 Decided: November 19, 2003.
 
 COPYRIGHT MATERIAL OMITTED ARGUED: David Isaac Bruck, Law Offices of David I. Bruck, Columbia, South Carolina, for Appellant.
 Andrew Frederick Lindemann, Davidson, Morrison & Lindemann, Columbia, South Carolina, for Appellees. ON BRIEF: Robert E. Lominack, Law Offices of David I. Bruck, Columbia, South Carolina, for Appellant. James E. Parham, Jr., Irmo, South Carolina, for Appellees.
 Before LUTTIG, WILLIAMS, and TRAXLER, Circuit Judges.
 Vacated and remanded by published opinion. Judge TRAXLER wrote the majority opinion, in which Judge WILLIAMS joined. Judge LUTTIG wrote a dissenting opinion.
 OPINION
 TRAXLER, Circuit Judge:
 
 
 1
 Clinton W. Odom appeals the district court's entry of summary judgment based on qualified immunity in favor of correctional officers Perry Powell, David Evans, and Willy Taylor. Odom asserts that Powell, Evans, and Taylor were deliberately indifferent to his safety, in violation of the Eighth Amendment, when they ignored Odom's requests for protection against an assault committed by fellow inmates at Evans Correctional Institution (ECI). According to Odom's uncontradicted version of the facts, the defendants knew the inmates intended to kill or seriously injure him and the defendants even watched as these inmates worked for at least forty-five minutes to break into an outdoor recreational cage in which Odom was being held, yet ignored Odom's pleas for help. The defendants failed to submit any evidence explaining why they did not grant Odom's request to be removed from his cage despite the clear and substantial risk posed by the hostile inmates in the adjoining cage. Accordingly, we vacate the district court's order and remand for further proceedings.
 
 I.
 
 2
 Odom presents evidence to support the following version of events. On June 15, 2000, shortly after 9:00 p.m., Odom's fellow inmates started a fire in order to create an opportunity to attack Odom. Because of the fire, inmates were moved from their cells to outdoor, chain-link cages used for temporary confinement in the recreation yard.
 
 
 3
 As he was being moved from his cell, Odom warned Powell that a group of fellow inmates would kill him if he were put in an area where they could gain access to him. When Odom told Powell repeatedly that he if he was put "on the rec[reational] field, they are going to try and kill me," Powell dismissed his concern, stating that "those dudes ain't going to f____ with you." J.A. 11-12.
 
 
 4
 However, Powell's hasty dismissal of Odom's fears about his safety soon proved to be mistaken. Several inmates from the Special Management Unit where Odom was assigned demanded that defendant Evans put them in Odom's cage. When they were put in the adjoining cage instead, they immediately began tearing down the fence that separated them from Odom and making verbal threats to Odom. Odom's pleas to be removed from the cage fell on deaf ears:
 
 
 5
 [U]pon the inmates entering this [adjoining] cage it was very evident what th[ei]r [p]lan was, by the verbal threats and actions of trying to breakout of th[ei]r cage and into the one [I] was in. As time continued, and it became more ap[p]arent of these inmates['] intentions, [I] begged the defendants to get me out of the cage more times th [a]n I can recall. I pleaded for the defendants to help me and to get me out. My pleas were ignored and laughed at by the defendants. At one point [Officer] Alford and [Sergeant] Martin told P. Powell, W. Taylor, and D.J. Evans [the defendants] to get me out, but all of them ignored this order. One of the [d]efendants even made the remar[k] that [I] "should not have snitched on them." When asked by an inmate what was going on, [Officer] Powell stated, "they got th[ei]r snitch."
 
 
 6
 J.A. 107.
 
 
 7
 Powell actually observed Odom's eventual attackers trying to break into Odom's cage soon after they had been placed in the neighboring cage. In fact, Powell filed an incident report acknowledging that he saw several inmates destroying the fence separating the two recreational cages. There is no evidence, however, that Powell attempted to remove Odom or responded in any way. To the contrary, Powell simply observed that the inmates who were about to assault Odom had "got[ten] th[ei]r snitch." J.A. 107.
 
 
 8
 Likewise, Odom's evidence showed that Evans was aware of the risk of harm to Odom. Odom told Evans more than once that this group of inmates intended to harm him. When the inmates told Evans they wanted to be placed in Odom's cage, Odom protested and told Evans that they intended to attack him. Later, after Odom's attackers had been placed in the adjacent cage and had begun the forty-five minute process of breaking into Odom's cage, Odom again asked Evans for help. When Evans approached, one of the inmates pulled a piece of chain link fence out of his back pocket and threatened to stab Evans. Evans then withdrew, looking at Odom and stating "I ain't f with you." J.A. 13. There is no evidence that Evans took any additional action to assist Odom.
 
 
 9
 Odom also tried to get help from Officer Taylor. According to Odom, the same inmate who threatened Officer Evans "stuck his arm out the rec[reational] cage handcuff hole and started pushing little pieces of tissue in the lock on [Odom's] rec [reational] cage door in order to jam it so it could not be unlocked." J.A. at 13. Odom tried to prevent this by slapping the inmate's hand away from the lock, but when the inmate tried to stab Odom's hand and arm, Odom was "forced to move away." J.A. at 13. Concerned that he would be a sitting duck if the lock were disabled, Odom begged Taylor to remove him, but Taylor ignored him.
 
 
 10
 Not only did the defendants ignore Odom's requests for help and the inmates' efforts to break into Odom's cage, but they ignored directives from fellow correctional officers Martin and Alford to remove Odom. Alford noticed "several inmates were working to tear the chain-link fence in order to get into the Plaintiff's recreation area." J.A. 69. At the same time, inmates in "adjoining recreation areas" were goading one of the inmates in Odom's recreational cage, Timothy Evans, into assaulting Odom. J.A. at 69. Inmate Evans eventually struck Odom and a fight ensued between them, forcing Alford to use pepper spray to break it up. Powell's incident report indicates he also witnessed this scene. Odom asserts, without contradiction, that Alford and Martin told Powell, Evans and Taylor they needed to "get [Odom] out," but Odom was left in the cage. J.A. 107.
 
 
 11
 Shortly after 10:00 p.m., several inmates from the adjoining cage finally destroyed enough of the fence to climb into Odom's cage and brutally attack him. Alford and Martin used pepper spray on the inmates after the assault was in progress. According to Odom, this effort was temporarily successful and the attackers retreated to their own cage, but some five minutes later, two of the attackers returned to Odom's cage and, picking up Odom, swung him face first into the fence. The second beating lasted until Odom's attackers "got tired." J.A. 108. Forty-five minutes later, Odom was removed from the cage on a stretcher with three broken ribs.
 
 
 12
 Odom filed a pro se complaint under 42 U.S.C.A. § 1983 (West 2003), alleging that prison officials violated his Eighth Amendment rights by knowingly and willingly placing his life in danger. He named as defendants the South Carolina Department of Corrections (SCDC); SCDC Director Doug Catoe; several individual correctional officers, including Evans, Powell, and Taylor; the SCDC Medical Facility; and other personnel employed by SCDC. The district court dismissed the complaint as to SCDC and Catoe, and granted summary judgment to the remaining defendants based on qualified immunity.[1] This appeal followed.
 
 II.
 
 13
 We review de novo an award of summary judgment based on qualified immunity. See Taylor v. McDuffie, 155 F.3d 479, 482 (4th Cir.1998). In determining whether summary judgment is appropriate, we must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). And, "[i]n deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor." Taylor, 155 F.3d at 482.
 
 
 14
 Because Powell, Evans, and Taylor have invoked qualified immunity as a defense, we examine this case under the two-step qualified immunity analysis. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The "threshold question" in the qualified immunity analysis on summary judgment is whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show [that] the officer's conduct violated a constitutional right." Id.[2] "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id.; see Figg v. Schroeder, 312 F.3d 625, 635 (4th Cir.2002). If, however, the facts alleged show a constitutional violation, "then the next step is to ask whether the constitutional right was clearly established in the specific context of the case." Figg, 312 F.3d at 635 (internal quotation marks omitted).
 
 
 15
 The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotation marks omitted). "[G]ratuitously allowing the beating ... of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency." Id. (internal quotation marks, alteration and citation omitted). However, not "every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety." Id. at 834, 114 S.Ct. 1970. To establish a claim under the Eighth Amendment, a prisoner must satisfy two elements. "First, the deprivation alleged must be, objectively, `sufficiently serious.'" Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir.2003). "[T]o demonstrate such an extreme deprivation, a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." Id. (internal quotation marks and citation omitted).
 
 
 16
 Second, a prisoner must present evidence that the prison officials had a "`sufficiently culpable state of mind.'" Farmer, 511 U.S. at 834, 114 S.Ct. 1970 (quoting Wilson, 501 U.S. at 297, 111 S.Ct. 2321). When an inmate challenges the conditions of his confinement under the Eighth Amendment, the requisite "state of mind is one of `deliberate indifference' to inmate health or safety." Id. (quoting Wilson, 501 U.S. at 302-03, 111 S.Ct. 2321). A prison official shows deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S.Ct. 1970. "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure reasonable safety." Id. at 844, 114 S.Ct. 1970 (internal quotation marks omitted).
 
 
 17
 Because Odom has presented evidence of significant physical injury resulting from the allegedly unconstitutional conditions, his alleged deprivation is "sufficiently serious" to survive summary judgment on the first element under Farmer. See, e.g., Case v. Ahitow, 301 F.3d 605, 606 (7th Cir.2002) (serious physical injuries received in violent assault by fellow inmate were sufficiently serious under Eighth Amendment). Accordingly, we turn to the question of whether Powell, Evans, and Taylor showed deliberate indifference. That is, we must decide whether the defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and whether they in fact drew such an inference but disregarded it. Farmer, 511 U.S. at 837, 114 S.Ct. 1970.
 
 
 18
 With respect to all three defendants, Odom's uncontradicted sworn statements are sufficient to show that they were aware of the risk of harm and simply ignored it. According to Odom, as soon as his attackers entered the adjoining cage, they issued verbal threats and began trying to break into Odom's cage, a process that lasted for at least forty-five minutes and ultimately succeeded. Odom's characterization of the inmates' intent to harm him as "evident" and "apparent" is uncontradicted by the defendants.
 
 
 19
 On this record, it is more than reasonable to conclude that Powell was both aware of an excessive risk of harm to Odom and simply disregarded it. Among other things, Powell was told by Odom repeatedly that he feared for his safety if he were placed with the other inmates. Powell thereafter witnessed the aggressors goading another inmate into attacking Odom, observed these inmates destroying the fence separating them from Odom, and heard them making violent threats to Odom. As the inmates continued to progress on breaking into Odom's cage, officers Alford and Martin became concerned with Odom's safety and told Powell to remove Odom. Powell's response, which is not contradicted by the defendants, was flippant: he figured "they got th[ei]r snitch." J.A. 107. When viewed in the light most favorable to Odom, the evidence shows that Powell knew that Odom's fellow inmates intended to inflict serious harm on him, that they had the opportunity to do so while being held in the adjoining cage, and that Odom was in serious peril without immediate intervention from the guards. There is no evidence, however, that Powell did anything to help, nor is there evidence explaining why he did not respond to Odom's requests in the face of a serious risk of harm.
 
 
 20
 The evidence permits the same conclusion for Evans. He had personal knowledge that these inmates wanted to be put in Odom's cage and that Odom feared these inmates would assault him. Evans decided, therefore, not to risk putting these inmates in with Odom, obviously aware of the danger to Odom if Odom were accessible to them. It is reasonable to infer that when Evans noticed the inmates destroying the fence separating them from Odom, he recognized that Odom was in immediate danger. Indeed, at one point Evans went to get Odom out. But, when Evans was threatened by one of the caged inmates with a broken-off piece of the fence separating Odom from the inmates, he withdrew and left the inmates to continue their destruction of the fence. Evans apparently took no further steps to help Odom, even though he surely recognized that Odom needed assistance. Evans also offers no evidence explaining why he took no action in response to Odom's requests. According to Odom's uncontested statement, Evans chose to ignore his pleas for help even though it was clear that Odom would be attacked absent some response by the guards.
 
 
 21
 Likewise, the evidence on this record allows a similar conclusion that Taylor was aware of an excessive risk of harm to Odom and ignored it. Odom repeatedly begged Taylor, like the others, to be removed from his cage, only to be scolded by Taylor that "you should not have snitched on them guys[,] you stupid [expletive]." J.A. 13. Certainly, a reasonable person could infer from this statement an awareness of the danger to Odom and a deliberate disregard of that danger. No doubt this expressed lack of concern could have readily encouraged the inmates to redouble their efforts, comfortable in the fact that Taylor was condoning what the inmates were trying to do. Finally, it is also reasonable to conclude that Taylor witnessed the inmates' efforts to break into Odom's cage in light of the evidence that Alford and Martin told all three defendants, within earshot of Odom's cage, that Odom needed to be removed. Taylor also points to no evidence showing he responded in any way whatsoever or explaining why he did not respond.[3]
 
 
 22
 If Powell, Evans, and Taylor did not believe the inmates could get through the fence, or if their responsibilities from the fire occupied all of their time, they might have a defense. But they do not present evidence to show either. For that matter, the defendants fail to offer any evidence in support of any other justification for their actions. If we are to view the events from the officers' perspectives, the defendants could help themselves by educating us on that score. But the only evidence submitted in support of the defendants' motion for summary judgment is a sworn statement from Alford, who only reported his own efforts to protect Odom with tear gas and who does not deny asking the defendants to get Odom out of his cell; a sworn statement from James Griffin, an investigator employed by the South Carolina Department of Corrections, who states that he did not witness the incident; and a handful of routine incident reports submitted from various guards that do not contradict Odom's version of the events that day.
 
 
 23
 Odom presents evidence that Powell saw the inmates destroying the fence between them and Odom, and did nothing; that Evans realized Odom was in danger, but walked away from Odom when Evans was personally threatened by one of the inmates; and that Taylor told Odom, in effect, that Odom was going to get what he deserved. And, all three refused to help when two guards watching the yard told them to get Odom out of the cage. If what Odom says is true, and at this stage we must presume that it is, then Odom has produced sufficient evidence to prove that Powell, Evans, and Taylor were deliberately indifferent to Odom's safety and that his injuries were the result of their violation of his constitutional rights.
 
 
 24
 Viewing this evidence in the light most favorable to Odom, we are satisfied that Odom has successfully negotiated the first hurdle of qualified immunity, presenting evidence which, if believed, would establish that the defendants' conduct violated his rights under the Eighth Amendment.
 
 III.
 
 25
 Next, we turn to the question of "whether the established contours of the Eighth Amendment were sufficiently clear [in June 2000] to make it plain to reasonable officers that their actions under these particular circumstances violated [Odom's] rights." Winfield v. Bass, 106 F.3d 525, 531 (4th Cir.1997) (en banc). In determining whether the right in question was clearly established, we must define "the right allegedly violated ... at the appropriate level of specificity." Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). This does not mean that "the exact conduct at issue [must] ... have been held unlawful for the law governing an officer's actions to be clearly established." Amaechi v. West, 237 F.3d 356, 362 (4th Cir.2001). Rather, our analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Id. at 362-63 (internal quotation marks omitted). The right must be defined "in such a way as to provide notice to a reasonable person in the official's position that his conduct violated the identified right." Id. at 363. That is, the right allegedly abridged is "clearly established" for qualified immunity purposes if
 
 
 26
 [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.
 
 
 27
 Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citation omitted).
 
 
 28
 Specifically, then, the question is whether it was clearly established in June 2000 that the defendants' failure to act in response to Odom's requests to be removed from the cage adjacent to his attackers constituted deliberate indifference to Odom's Eighth Amendment rights under the circumstances. We conclude that it was.
 
 
 29
 In June 2000, it was clearly established in this circuit that correctional officers who are present when a violent altercation involving an armed inmate erupts and fail to intervene immediately do not violate the Eighth Amendment if the officers are unarmed, unaware of a risk of harm prior to the altercation, and take reasonable steps to intervene safely. See Winfield, 106 F.3d at 531-32. By the same token, we had also determined, well before the time of this attack, that a correctional officer who stands by as a passive observer and takes no action whatsoever to intervene during an assault violates the rights of the victim inmate. See Gordon v. Leeke, 574 F.2d 1147, 1152 (4th Cir.1978). Gordon does not suggest whether the officers knew about the potential violence before the attack or whether they were merely present when the fight broke out; nevertheless, the plaintiff stated a viable claim as a result of the officers' failure to take any action whatsoever.
 
 
 30
 Other circuit courts of appeal, at the time of the attack, had concluded that a prison official acts with deliberate indifference when he ignores repeated requests from a vulnerable inmate to be separated from a fellow inmate who has issued violent threats which the aggressor will likely carry out in the absence of official intervention. See, e.g., Spruce v. Sargent, 149 F.3d 783, 786 (8th Cir.1998); Haley v. Gross, 86 F.3d 630, 642 (7th Cir.1996); Hayes v. New York City Dep't of Corr., 84 F.3d 614, 621 (2nd Cir.1996); Roland v. Johnson, 856 F.2d 764, 770 (6th Cir.1988). We conclude that, at the time of the attack on Odom, the state of pre-existing law was such that reasonable prison guards in the defendants' position would have understood that doing nothing in response to Odom's requests in light of the circumstances of this case violated Odom's rights.
 
 IV.
 
 31
 The differences of opinion in this case apparently stem from differences as to what our standard of review is in matters involving summary judgment. The law, however, is clear that we are to view the evidence in a light most favorable to the nonmoving party and to give him the benefit of all reasonable inferences. See United States v. West Virginia, 339 F.3d 212, 214 (4th Cir.2003). This necessarily means that where Odom's testimony is credible and uncontradicted, his testimony will be accepted. There is nothing nefarious about this process. It is how the standard of review operates. We also must give Odom the benefit of all reasonable inferences. Again, that is how the standard of review operates. For example, when Powell responded to Odom's fear of assault by saying "those dudes ain't going to f____ with you," a completely reasonable inference that could be drawn by a factfinder is that Powell was dismissing Odom's concerns, similar to an "aw, don't worry about it" response. By contrast, our dissenting colleague draws a different inference from Powell's statement, one that favors Powell, viewing it as "an expression that others would not be permitted to harm Odom." Infra at 777. Assuming the latter inference is even a reasonable one to make,[4] we are presented with an example that highlights the nub of our dispute — when we are presented with two reasonable inferences, we are constrained on summary judgment to accept the one most favorable to the non-moving party.
 
 
 32
 When we take all of the evidence and view it in this context, we find Odom's evidence sufficient to make out a claim against the defendants. In fact, our job here is easier than in most cases because none of the defendants have submitted affidavits denying that what Odom says is true. Not one defendant has, under penalty of perjury, contradicted the actions and motives Odom ascribes to him.
 
 
 33
 In essence, this case boils down to a prisoner presenting facts that reasonably support the conclusion that he was not protected in the face of a known and avoidable danger, and the guards, accused of deliberate indifference, not denying it. If prisoners are going to be denied equal application of the law, then guards who are sued would be better advised not to respond with explanations of their own, but to wait and let an appellate court manufacture an excuse for them. In our view, the only way to reach a result that gives the defendants immunity is to take Odom's statements, turn a blind eye to what is favorable to Odom, view the evidence only for the benefit of the guards, and ignore the standard of review. But, this is impermissible if we are to follow the law.
 
 
 34
 Accordingly, for the foregoing reasons, we vacate the district court's entry of summary judgment on behalf of the defendants and remand the matter for further proceedings.
 
 
 VACATED AND REMANDED
 
 
 
 Notes:
 
 
 [1]
 Pursuant to 28 U.S.C.A. § 636(b)(1)(B) (West Supp.2003), a magistrate judge reviewed Odom's case and recommended entry of summary judgment. The district court accepted this recommendation without modification. In the interest of simplicity, the magistrate judge's report and recommendation is referred to throughout this opinion as the district court's opinion
 
 
 [2]
 Our colleague does an admirable job of taking the evidence from Odom and presenting it with flourish and hyperbole in a light most favorable to the guards. Unfortunately, this approach is contrary to the legal standard we are to apply on summary judgment. For example, it is suggested by our friend that we have "omit[ted] any reference to the fact that the defendants knew at all times that other guards ... were standing by, armed with pepper spray and ready to intervene if hostile inmates were able to tear a hole in the fence of Odom's cage and attempt an assault on Odom."Infra at 778.
 There are several reasons why such a statement is not included in our opinion. The most obvious reason is that no one says it. The defendants have provided no affidavits to show what they knew or what they believed. To reach the conclusion proposed we would have to draw an inference the guards knew or believed that someone else would protect Odom. But this would be an inference in favor of the defendants, which we are prohibited from drawing under the summary judgment rules, see Taylor, 155 F.3d at 482, particularly where Odom gives a statement under oath that the guards, who were theoretically being relied on by the defendants, were themselves asking the defendants to get Odom out of the cage. This confusion over the summary judgment standard persists throughout the dissent.
 
 
 [3]
 In his dissent, our friend worries that we have omitted important allegations from Odom's complaint, which suggested that "at the very moment that Odom shouted at Taylor to free him from his cage, Taylor wasevacuating other prisoners out of the burning prison facility." Infra at 778. The inference made by our friend is that Odom only asked Taylor for help one time. This inference would be strained even if we were viewing Odom's complaint in a light most favorable to the guards. But, to repeat yet again, this is not our standard of review. In addition to the allegations in Odom's complaint, the record contains statements by Odom made under oath that are uncontradicted by the defendants. Those statements show that Odom continuously begged the defendants for help and that, in response to those pleas, even guards Alford and Martin at one point told Taylor and the other defendants to get Odom out of the cage. Odom states that the defendants laughed at his pleas and ignored Alford and Martin's order to get Odom out.
 This evidence can reasonably be viewed as establishing that the danger to Odom was obvious, that continuous requests for help were being made to Taylor and the other defendants by Odom, that a request was made by other guards to Taylor and the other defendants to help Odom, and that the refusal of the defendants to help Odom was not due to the fire or the anticipated assistance from other guards, but because of the deliberate indifference of the defendants.
 
 
 [4]
 It is honestly no more "obvious" to us that Powell's profane response can only be viewed as some kind of official statement, than would be Taylor's response to Odom that "you should not have snitched on them guys you stupid m____." J.A. 13. But, in any event, we know our disagreement with our dissenting brother is one that stems from an honest difference of opinion among colleagues (whichis possible), rather than "flat mischaracterizations" and agenda-driven judicial monkey-shines on his part.
 LUTTIG, Circuit Judge, dissenting:
 On the face of the allegations as Odom makes them, not as the majority distorts them, it is indisputable that the defendant prison officials responded constitutionally throughout the emergency with which they were confronted. Indeed, the denial of qualified immunity to these officials, given the exigent circumstances and their responsible conduct in those circumstances, may well represent the most far-reaching decision to date denying qualified immunity in our circuit.
 Needless to say, the court's opinion is not even arguably reconcilable with our precedent in Robles v. Prince George's County, 302 F.3d 262, 266-67, 269 (4th Cir.2002), reh'g denied, 308 F.3d 437, in which we granted qualified immunity to officers who, in the middle of the night and in a deserted parking lot, handcuffed a man to a metal pole, and left him there, admittedly for no law enforcement purpose whatsoever. Thus, apart from the commission of error in this case, the majority also extends to the other end of the qualified immunity continuum the confusion that the court sowed by its decision in Robles, rendering principled predictions as to the availability of qualified immunity in our circuit now all but impossible.
 It might be thought the saving grace of today's decision, that it will not be followed by the members of our court any more faithfully than has Robles. Properly viewed, however, this is the tragedy of such opinions, not their grace. For such confirms (for the cynic at least) that law really is but the ad hoc, not the principled application of pre-existing rule to fact.
 I.
 The majority's opinion is riddled with three distinct categories of error, all of which are evident upon a reading of Odom's own complaint. First, the majority selectively recites the contextual facts from Odom's allegations and the record, featuring only those facts that tend to bolster its conclusion, and excluding those facts that undermine its disposition. Next, it engages in advocatory characterization of the facts that it does choose to recite, presenting them in such a way that they are unrecognizable as they are alleged in Odom's own pleadings. Finally, the majority simply omits altogether those facts that would, in and of themselves, confirm the error of its holdings both as to a constitutional violation and as to the reasonableness of the defendants' actions. Through this composite of errors, the majority fails both to capture fairly the volatile circumstances Officers Powell, Evans and Taylor faced and to detail the emminently reasonable actions that each took in the course of their response to those exigent circumstances.
 The irony in the end is that the majority postures itself as merely scrupulously repeating the allegations in the complaint and resting decision exclusively on those allegations, when in fact, itself not content to accept the plaintiff's allegations as they have been made, the majority has resorted to full-throated advocacy on the plaintiff's behalf.
 The telling fact is this. If one reads Odom's handwritten complaint, he is actually struck by the care and specificity with which Odom has described the events of which he complains. From his description, it is plain that Odom does not allege a constitutional violation, but at least one is left with the belief that Odom has been scrupulously exacting in the allegations that he has made. In contrast, if one reads Odom's complaint, and then compares it with the majority's asserted recitation of Odom's report of events and allegations, one is left with the unmistakable impression that the majority has been anything but scrupulously exacting in its presentation of Odom's well-pleaded complaint.
 A.
 As to its selective recitation of Odom's allegations, the majority, first, hardly even acknowledges that the defendants' actions were taken during and in response to a fire that had engulfed the Special Management Unit where Odom was housed. Thus, despite its professed reliance upon Odom's allegations, the majority chooses not to include Odom's own description of the fire, which confirms the magnitude of the emergency with which the defendants were faced. According to Odom himself, "the fire reached such a level to where the whole B-side of the [Special Management Unit] had to be evacuated due to the smoke being so bad, that the officers had to put on oxygen tanks, and gas masks in order to evacuate the building." J.A. 11. Indeed, Odom states that at the moment when Officer Powell arrived to evacuate him from his cell, the smoke was so suffocating that he "could not breath [sic]." J.A. 106. In short, the defendants were evacuating prison inmates in response to a full-scale emergency — the burning of the building in which the inmates were housed — a fact that the majority all but ignores both in its factual recitation and in its analysis.
 Second, although the majority refers in passing to the fact that Odom was housed in the Special Management Unit, it similarly chooses not to explain that this unit is the high-security ward at Evans Correctional Institution, in which the most dangerous inmates are kept segregated in their individual cells for twenty-three hours per day because of their dangerousness. J.A. 226. Relatedly, the majority also chooses not to mention that Odom was placed in this high security unit because he was found in possession of a homemade weapon. J.A. 225. Thus, when the Special Management Unit caught on fire, the defendants were faced with the task of evacuating and controlling not rank-and-file prison inmates, but the most dangerous and disobedient inmates in the correctional facility — another fact ignored by the majority in both its factual recitation and its analysis.
 Third, although the majority notes that, when the fire broke out, the Special Management Unit inmates had to be moved from their cells into outside recreational cages, it also chooses not to cite those portions of the record that reveal the difficulty the guards had in maintaining control over those inmates once they were outside the burning building. For example, Odom reports that even before inmates broke into his cage, "[s]everal cages down ... several inmates had succeeded in busting a hole in [their] rec cage door and escaped from [their] cage and went to the next cage to help those inmates escape from [their] cage. [And][o]nce all of them were out, they started trying to break into the cage I was in." J.A. 14. A report filed by Captain Rogers, who was in command at the prison, explains that even after the Special Management Unit wing was finally cleared of smoke, "inmates refused to be restrained and placed back in their cells." J.A. 80. And, in fact, the guards ultimately had to call for reinforcements, force all the inmates to lie on the ground, and then strip search them before they could be allowed back into their permanent cells following the fire. Id. Thus, the picture that emerges from Odom's actual allegations (together with the uncontradicted record reports), as opposed to that painted by the majority, is not one of calm and orderliness during which guards stood idly by, but rather one of pandemonium that could well have devolved into full riot. Again, another fact all but ignored by the majority in its factual recitation and in its analysis.
 To read the majority's opinion, then, one would scarcely know that, as Odom candidly alleges, the events in question took place during the emergency evacuation of the high-security unit at Evans Correctional Institution, during which the defendants were responding to near riotous conduct by the prison's most dangerous inmates.
 B.
 Having selectively recited Odom's allegations so as to minimize the magnitude of the exigency confronting the defendants, the majority next mischaracterizes the defendants' actions in ways so as to build the impression that those actions were anything but reasonable.
 First, for example, the majority characterizes Powell as having "dismissed" Odom's concerns, when he said to Odom that "those dudes ain't going to f____ with you." It is not even credible to draw the inference that the majority does, that this statement was a "dismissal" of Odom's concerns, evidencing deliberate indifference. No reasonable factfinder could so find. To the contrary, on their face, these words reflect not only an acknowledgment of those concerns, but an expression that others would not be permitted to harm Odom. Were there any doubt as to this (which there is not), it would be laid to rest by yet another of Odom's allegations. In that allegation, which immediately precedes the one referenced above and, again, is left out by the majority, Odom states as follows: "Once ... Powell got to my cell to place the cuffs on me, I told him `I can't go out there with those guys on the rec field, they are going to try and kill me.' He [Powell] stated `O.K. come on,' so I put the cuffs on and he opened my cell door." J.A. at 11-12 (emphasis added).
 Second, in like (mis)characterization, in summarizing Evans' actions, the majority asserts that "[t]here is no evidence that Evans took any action to assist Odom." J.A. 5. A more inaccurate characterization of Odom's own complaint could hardly be imagined. Odom himself reports that after Officer Evans placed him in an outside cage, Evans proceeded to evacuate another group of prisoners from the building. And Odom also reports that when Odom's enemies asked Evans to place them in Odom's cage, Evans refused and instead placed the hostile inmates in cages separate from Odom's, in order to protect Odom. J.A. 12.
 Indeed, later, when Evans observed the inmates in the cage adjoining Odom's attempting to tear a hole in the fence, he went to Odom's cage to let Odom out, and retreated only when one of Odom's enemies brandished "a sharpened piece of fence band" and shouted at Evans that he would "stab the [expletive] out of [him]" if he continued to approach. J.A. 13. While, in his pleading, Odom included this account of Evans' initial attempts to rescue Odom, J.A. 13, Odom omitted mention of Evans' effort in the declaration of facts that he filed with his memorandum opposing the defendants' motion for summary judgment, see J.A. 107. Thus, even though the majority fails to appreciate the negative implications of this information for Odom's chances of success on the merits, Odom certainly understood those implications.
 Again, Odom's own allegations prove the error in the majority's mischaracterization that there is "no evidence that Evans took any action to assist Odom."
 Third, the majority mischaracterizes the actions of Odom's enemies, in order to buttress its dubious conclusion that the defendants were aware that Odom was in danger for the entire time that he was in the outside cage. According to the majority, when Odom's enemies were evacuated into the adjoining cage, "they immediately began tearing down the fence that separated them from Odom." Ante at 767. Yet again, Odom himself tells a different story. According to Odom, the inmates first "started kicking on the chain link fence trying to bust through it. This was not working, so they took their towells [sic] put them through the fence and pulled them back through and started bending one of the chain links back and forth in order to weaken and break it." J.A. 13. Odom's own allegations, therefore, reveal not only that the first efforts of his enemies to access his cage failed but that their succeeding efforts did not appear any more likely to succeed — and certainly not sufficiently more likely to succeed as to render the threat so imminent that abandonment of the inmates' evacuation from the burning building was warranted.
 And there are similar inappropriate characterizations (and mischaracterizations at that) of Odom's pleadings throughout the majority's opinion.
 C.
 Finally, in addition to its selective recitation of facts and mischaracterization, the majority omits entirely to recite perhaps the most critical facts from Odom's allegations that ultimately prove the reasonableness of the actions taken by all of the defendants, and Taylor in particular.
 As to defendant Taylor, according to Odom's own pleadings, at the very moment that Odom shouted at Taylor to free him from his cage, Taylor was evacuating other prisoners out of the burning prison facility. Nowhere in the majority's opinion does this indisputably critical fact appear. Compare J.A. 13 with ante at 768, 771-72. And after Taylor finished with the evacuation of those prisoners, he returned into the building to continue to rescue others. See J.A. 13, 81.
 But similar omissions from the pleadings are made by the majority when those alleged facts would negate its conclusion of unconstitutional conduct by all three of the defendants. Among others, the majority omits any reference to the fact that the defendants knew at all times that other guards — whom Odom has not named as defendants here — were standing by, armed with pepper spray and able to intervene if hostile inmates were able to tear a hole in the fence of Odom's cage and attempt an assault on Odom, see ante at 769-71. And this fact not only appears on the face of Odom's complaint, but, needless to say, contrary to the majority's unconvincing assertion, see ante at 769 n. 2, requires no inference that the "guards knew or believed that someone else would protect Odom." Once again, as Odom's own complaint makes clear, Officer Alford, even before inmates broke into Odom's cage, had already used pepper spray on an inmate inside Odom's cage, whom other inmates goaded into attacking Odom. J.A. 15. And all in all, Officer Alford reports that he and Officer Moore discharged nine pounds of pepper spray on the hostile inmates that evening. Id. at 70. That other officers were present, armed with pepper spray, and able to intervene in any assault that did occur while the defendants completed the inmate evacuation from the burning building is plainly relevant, if not fully dispositive, of the reasonableness of these defendant's actions.
 D.
 
 
 [1]
 
 In sum, while posturing itself as but faithful scriveners of plaintiff's allegations, the majority selectively recites the facts that Odom himself candidly recites that convey the emergency context in which the defendants found themselves, leaving out that the fire that forced the evacuation was of such magnitude as to require oxygen masks and gas tanks; taking no notice whatever that the Special Management Unit under evacuation was the facility's high-security ward, home to the most uncontrollable of the uncontrollable; and making no mention at all of the difficulties that beset the guards in attempting to bring under control these inmates, who, once evacuated from the burning building, began to riot.
 The majority additionally characterizes and mischaracterizes the record, inaccurately (not to mention unfairly) describing Officer Powell's conduct as dismissive of Odom's concerns, when in fact Powell actually evinced genuine concern for Odom not only by personally rescuing him from the fire, but also by his reassurances in reply to Odom's expressions of fear; criticizing Evans for doing nothing to assist Odom, when in fact Evans took affirmative steps to protect Odom from harm; and misleadingly describing the hostile inmates as immediately having begun to tear down the fence, when in truth their initial attempts to weaken the fence had failed and their subsequent efforts appeared destined, if not to fail, then to prove time-consuming.
 And, if this were not enough, the majority deliberately omits critical information from Odom's own allegations that confirms the reasonableness of the defendants' actions, failing even to mention Odom's own statement that Taylor was in the process of evacuating other inmates when Odom called to him, and omitting all reference whatsoever to the fact that other guards armed with pepper spray were standing by at all times, ready to quell any attack on Odom that materialized.
 
 
 [2]
 
 When Odom's allegations are fairly and honestly presented in full, an entirely different picture emerges from that painted by the majority. In that picture, guards at a high-security prison were evacuating the worst of the worst as the prison filled with suffocating smoke from a fire set by the prisoners themselves. One of those prison guards, Powell, who was wearing an oxygen tank and a gas mask, personally rescued Odom from his cellblock and led him to the safety of an outside recreational cage. When Odom noticed that another guard, Evans, was evacuating some of his enemies, Odom pleaded with Evans that these inmates not be allowed into his recreational cage, and Evans responded to those pleas by placing Odom's enemies in a cage separate from Odom's. And later, when Odom saw that his enemies were trying to use towels to weaken the fence separating his cage from theirs, he called out and Evans came to his rescue, retreating only when an inmate threatened to stab him if he proceeded further. Odom then called out to yet another officer, Taylor, but Taylor was occupied with the ongoing evacuation at that time. And all the while, other guards, armed with pepper spray, were present, ready to assist Odom should be become the victim of an inmate's assault, and ultimately in fact assisting him when inmates finally did break through and into Odom's cage.
 It is not even arguable that anything occurred in this sequence of events that comes anywhere close to an Eighth Amendment violation.
 II.
 A.
 The majority's qualified immunity analysis is even more strikingly indefensible than its Eighth Amendment analysis. The majority cites as controlling Fourth Circuit precedent Gordon v. Leeke, 574 F.2d 1147 (4th Cir.1978), stating that, on the strength of this opinion, it was well-established at the time of the attack on Odom "that a correctional officer who stands by as a passive observer and takes no action whatsoever to intervene during an assault violates the rights of the victim inmate." Ante at 773. Gordon v. Leeke, which includes only a handful of lines even addressing the Eighth Amendment claim, is, to the extent that one can discern anything at all about the allegations in that case, of no relevance whatsoever to the case before us.
 There, we held that it was error for a district court to grant summary judgment to prison guards on an inmate's claim of Eighth Amendment violation, where the inmate had alleged that the guards stood idly by and watched while other inmates raped and robbed him. Gordon, 574 F.2d at 1152. Quite obviously, Powell, Evans and Taylor neither "stood idly by" nor were "passive observers." Rather, even from Odom's own allegations (which the majority distorts), it is clear that Powell personally evacuated Odom from his cell, that Evans attempted to free Odom from his cage until inmates threatened to stab him, forcing him to retreat, and that Taylor was evacuating other Special Management Unit prisoners from the burning building at the time that Odom called for help.
 Moreover, unlike in Gordon, where the officers who did stand idly by were the only ones who observed the rape, here, other officers, armed with pepper spray, were present to observe, and respond affirmatively to prevent, any serious assault upon Odom by other inmates.
 And if these distinctions were not enough, unlike in this case, there were no exigent circumstances of any kind whatsoever present in Gordon, against the backdrop of which the reasonableness of the defendants' conduct must be assessed.
 Even to suggest, much less hold, as the majority does, that Gordon v. Leeke constituted clearly established law that these defendants' actions were unconstitutional is simply indefensible.
 B.
 Unable to find authority from our circuit that even comes close to supporting its disposition, the majority string cites four additional cases from other jurisdictions, which it claims in similarly general fashion support the proposition that "a prison official acts with deliberate indifference when he ignores repeated requests from a vulnerable inmate to be separated from a fellow inmate who has issued violent threats which the aggressor will likely carry out in the absence of official intervention." Ante at 773. If it is possible, these cases are even less relevant to the case sub judice than Gordon v. Leeke. Not only, as in Gordon v. Leeke, were there no exigent circumstances in any of these cases, but in each of these cases the defendant officers failed to respond over an extended period of time to the threat of which they had been made aware — a fact that the majority happens not to mention.
 In Spruce v. Sargent, 149 F.3d 783, 785-86 (8th Cir.1998), prison officials ignored for over twelve months an inmate's requests for protection from sexual assaults. In Haley v. Gross, 86 F.3d 630, 632-34 (7th Cir.1996), prison officials failed, for over five days, to respond to an inmate's request to be separated from his dangerous cellmate, who eventually set the cell on fire. In Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 617-19, 621 (2d Cir.1996), prison officials ignored for months the requests of an inmate with known enemies in the prison to be transferred to a different location. And in Roland v. Johnson, 856 F.2d 764, 765-67, 770 (6th Cir.1988), prison officials allowed certain individuals for a considerable period of time to enjoy the privilege of being able to access other inmates' cells, despite evidence of the privileged individuals' tendencies toward sexual aggression. The contrast between the facts in these cases and the facts here, where the defendants had only minutes, if not moments, within which to respond during an emergency, and actually did so, could not be any starker.
 To rest denial of qualified immunity on these authorities is nothing less than to read out of existence the foundational notice requirement that officials must have violated clearly established law in order to be held liable.
 III.
 That the majority's opinion is insupportable is only confirmed, as often is the case, by the nature of the response to the critique of its opinion. It presents itself as simply relying upon Odom's allegations, and this, without any characterization. But in responding to this dissent the majority does not even bother so much as to add reference to those allegations from Odom's complaint that it omits, nor remove its own advocatory characterizations. And neither does it attempt to marshal additional authority or clarify the authority relied upon in support of its legal conclusion that the defendants would have violated clearly established law had they conducted themselves as Odom alleges. Instead, it merely tries to deflect attention from its selective recitation of the contextual facts, its advocatory characterization, and its omission of facts, by suggesting that ours is a dispute over the standard of review on summary judgment, and that the majority, unlike the dissent, is simply drawing all inferences in favor of the plaintiff, as required. Ante at 773. As the majority well knows, this is not the nature of the dispute. I dissent from the majority's conclusion and opinion because it does not present the facts accurately, compare Hamdi v. Rumsfeld, 337 F.3d 335, 345 (4th Cir.2003) (Traxler, J., concurring in the denial of rehearing en banc), with 337 F.3d 335, 357 (Luttig, J., dissenting from denial of rehearing en banc), and when the facts are presented accurately, the majority's conclusion and opinion cannot withstand scrutiny.
 Because Odom's own allegations fail to establish even a prima facie case that the defendants violated any of Odom's rights under the Eighth Amendment, let alone "clearly established" ones, I would affirm the district court's grant of summary judgment, and I dissent from the unprecedented disposition announced by the majority today.