UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-7746

JAMES HERMAN RAYNOR,

Plaintiff - Appellant,

v.

G. PUGH, Housing Unit #1 Manager,

Defendant - Appellee,

and

HAROLD W. CLARK, Director of Department of Corrections;
MARIE VARGO, Ms.,

Defendants.

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.    Leonie M. Brinkema,
District Judge. (1:13-cv-01117-LMB-JFA)

Argued: December 8, 2015          Decided: March 17, 2016

Before MOTZ, KING, and KEENAN, Circuit Judges.

Vacated and remanded by published opinion.  Judge Motz wrote the
opinion, in which Judge King joined.  Judge Keenan wrote a
separate opinion concurring in part and concurring in the
judgment.

**ARGUED**: Brian David Schmalzbach, MCGUIREWOODS LLP, Richmond,
Virginia, for Appellant.   Trevor Stephen Cox, OFFICE OF THE

ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF**: John D. Adams, Katherine Mims Crocker, MCGUIREWOODS LLP, Richmond, Virginia, for Appellant. Mark R. Herring, Attorney General of Virginia, Cynthia E. Hudson, Chief Deputy Attorney General, Linda L. Bryant, Deputy Attorney General, Public Safety & Enforcement, Richard C. Vorhis, Senior Assistant Attorney General, J. Michael Parsons, Assistant Attorney General, Stuart A. Raphael, Solicitor General of Virginia, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

---

DIANA GRIBBON MOTZ, Circuit Judge:

James Herman Raynor, an inmate at a Virginia correctional facility, brought this action pursuant to 42 U.S.C. § 1983 (2012), alleging that a prison official violated the Eighth Amendment by failing to protect Raynor from an attack by another inmate. The district court granted the official's motion for summary judgment. For the reasons that follow, we vacate and remand for further proceedings.

I.

Raynor, an inmate at Sussex II State Prison, suffers from medical ailments, including seizures, blackouts, "blood issues," "heart issues," and "breath[ing] issues." In November 2012, Raynor, who was housed with inmate K. Mullins, asked prison officials to move him to a different cell with a "caretaker" inmate who had volunteered to assist him with his health conditions. On January 10, 2013, Raynor renewed his request with G. Pugh, the Prison Housing Manager for Raynor's unit. That day, Pugh informed Mullins that he, instead of Raynor, would have to relocate to a different cell.

According to Raynor, Mullins then threatened Raynor in front of Pugh, saying, "it's on," that they were both "going to seg[regated housing]," and that he "would physically assault [Raynor]." Raynor alleges that, in response, Pugh stated that

3

he did not care what Mullins did and ordered both men back into their cell. Soon after, Mullins smashed Raynor's television and punched him in the face multiple times, knocking him to the ground. Raynor alleges that Pugh watched the entire assault and did not call for assistance or take any action until after the attack had ended. Raynor also alleges that he sustained a significant injury from the assault. In addition to temporary facial injuries and bruising, when Mullins knocked him to the ground, the impact assertedly damaged his spine and tailbone. As a result of that spinal injury, he alleges that he now suffers constant and severe pain, numbness, and loss of control of his legs, and will be confined to a wheelchair for the rest of his life.

After exhausting his administrative remedies, Raynor filed this complaint pursuant to 42 U.S.C. § 1983 against Pugh.[1] Raynor alleges, and realleges in an amended complaint, that Pugh's deliberate indifference to Raynor's safety, and the resulting injuries, constituted cruel and unusual punishment in violation of the Eighth Amendment.

---

[1] Raynor also named as defendants Director of the Virginia Department of Corrections Harold Clarke and Sussex II Warden Marie Vargo. The district court dismissed the claims against these defendants because Raynor had failed to allege facts supporting supervisory liability. Raynor does not appeal those dismissals.

As evidence of Pugh's deliberate indifference, Raynor submitted a verified complaint and a corroborating affidavit from another inmate, who had witnessed the assault. To support his claim of serious injury, Raynor offered copies of several requests for medical attention for severe spinal pain, numbness, and uncontrollable falling after January 10th, some of which attribute these issues to the assault. Raynor also submitted six doctors' reports describing spinal x-rays before and after the assault, which he maintains describe damage to a different section of his spine post-assault than had already been injured. In an effort to further substantiate his claim, Raynor moved for production of the following materials from the prison: the security video of the incident, all prison reports related to the assault, any prison policies or procedures detailing staff responsibility for inmate safety, and any documents from the prison's investigation of the incident.

Although Pugh does not dispute that Mullins attacked Raynor, he disputes essentially every other fact alleged by Raynor. According to Pugh, Mullins made no threatening comments in Pugh's presence before the assault, and because the two inmates had gotten along in the past, he had no reason to anticipate one would attack the other. Pugh contends that he was in a different part of the housing unit during the alleged assault and was only "later informed" of an "altercation." Pugh

5

also maintains that, even if he had been present during an attack, prison policy would have prevented him from physically intervening without additional guards. He maintains that Raynor suffered only minor facial abrasions, as reflected in the "mild abrasions" noted in the medical report from the day of the assault. Pugh argues that Raynor suffered ongoing spinal problems due to a 2005 accident, so that to the extent Raynor does currently suffer from chronic back pain, that pain is not attributable to the asserted assault. Finally, Pugh points to the lack of any written grievances or medical forms from Raynor complaining of back pain before August 2013, seven months after the assault.

Pugh moved for summary judgment, arguing that "Raynor did not suffer a serious or significant physical injury for which Pugh would be liable under the Eighth Amendment," that "Pugh did not have a sufficiently culpable state of mind," and that Pugh was entitled to qualified immunity. On the same day, Pugh also moved for a protective order to stay discovery based on his qualified immunity defense. Raynor opposed both motions, reasserted his discovery requests, and filed a motion for an examination by a back specialist.

The district court denied Raynor's motions and granted Pugh's discovery protective order without reaching the merits of the qualified immunity defense. Seven months later, still

without resolving the issue of Pugh's asserted immunity from suit or ordering any discovery, the district court granted Pugh summary judgment. The court acknowledged that the parties "dispute[d]" both "defendant's motivation in not breaking up the fight between plaintiff and Mullins" and whether Raynor "suffered a severe injury to his spinal cord." However, it concluded that these disputes were not "genuine," due to an asserted lack of evidentiary support for Raynor's claims. Raynor timely noted this appeal.

## II.

The Eighth Amendment's prohibition on "cruel and unusual punishments" imposes certain basic duties on prison officials. Farmer v. Brennan, 511 U.S. 825, 832 (1994). These include maintaining humane conditions of confinement, including the provision of adequate medical care and, relevant to this case, "reasonable measures to guarantee the safety of the inmates." Id. (internal quotation marks omitted). Specifically, corrections officers have "a duty to protect prisoners from violence at the hands of other prisoners," for "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." Id. at 832, 834 (internal quotation marks and alterations omitted).

However, "not every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015) (internal quotation marks omitted). A plaintiff must satisfy a two-part test, consisting of both an objective and a subjective inquiry, for liability to attach.

First, the inmate "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury," or a substantial risk thereof. Danser v. Stansberry, 772 F.3d 340, 346-47 (4th Cir. 2014) (internal quotation marks omitted); see Farmer, 511 U.S. at 834. This objective inquiry "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 509 U.S. 25, 36 (1993).

Second, an inmate must show that the prison official had a "sufficiently culpable state of mind," which, in this context, consists of "deliberate indifference to inmate health or safety." Farmer, 511 U.S. at 834 (internal quotation marks omitted). This subjective inquiry requires "evidence suggesting that the prison official had actual knowledge of an excessive risk to the plaintiff's safety." Danser, 772 F.3d at 347. The

8

defendant must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837 (emphasis added). An inmate can, however, prove an official's actual knowledge of a substantial risk "in the usual ways, including inference from circumstantial evidence." Id. at 842. In other words, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id.

However, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk." Id. at 844. In failure-to-protect cases, "prison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm." Prosser v. Ross, 70 F.3d 1005, 1008 (8th Cir. 1995); see also Winfield v. Bass, 106 F.3d 525, 532 (4th Cir. 1997) (en banc) ("[S]uch heroic measures are not constitutionally required."). But "completely failing to take any action" to stop an ongoing assault on a prisoner can amount to deliberate indifference. Winfield, 106 F.3d at 532; see also, e.g., Odom v. S.C. Dep't of Corr., 349 F.3d 765, 773 (4th Cir. 2003) ("[A] correctional officer who stands by as a passive observer and takes no action whatsoever to intervene during an

9

assault violates the [Eighth Amendment] rights of the victim inmate."); Williams v. Mueller, 13 F.3d 1214, 1216 (8th Cir. 1994) ("A prison official acts with deliberate indifference to an inmate's safety when the official is present at the time of an assault and fails to intervene or otherwise act to end the assault."); cf. Prosser, 70 F.3d at 1008-09 (finding no deliberate indifference where prison guard ran to get help immediately after inmate threw first punch at plaintiff). Thus, courts have found that "a corrections officer's failure to intervene in a beating can be the basis of [§ 1983] liability" if the officer had a reasonable opportunity to act and "simply refused to do so." Smith v. Mensinger, 293 F.3d 641, 650 (3d. Cir. 2002).

III.

With these principles in mind, we consider whether the district court ignored genuine disputes of material fact and so erroneously granted summary judgment to Pugh. We review a court's grant of summary judgment de novo. PMB Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 119 (4th Cir. 2011). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether a genuine issue of material fact

10

exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

For the objective-injury prong, Raynor alleges specific facts describing the facial trauma and spinal injury caused by Mullins' attack. Raynor also submitted his verified complaint, describing the assault and his injuries in detail; several of written requests to the prison for medical attention, complaining of severe back pain and numbness; and six medical reports interpreting x-rays of his spine before and after the assault.[2] He offered a witnessing inmate's affidavit, which describes the impact from Mullins' final blow that allegedly caused Raynor's spinal injury. The witness swore that Raynor "fell backwards and hit the floor on his buttocks. He hit so hard he bounced off the floor and then landed again after going about three or four inches off the floor. Mr. Raynor then

---

[2] Our friend in concurrence suggests that Raynor "has not yet raised a genuine dispute" regarding his injury because his x-ray reports would be difficult for a lay person to interpret. However, when faced with documents purportedly related to a material issue but inscrutable to the court, we cannot "eliminate the possibility that genuine issues of material fact exist." Matherly v. Andrews, No. 14-7691, slip op. at 20 (4th Cir. March 16, 2016). Rather, summary judgment "should be granted only when it is perfectly clear that no issue of material fact exists." Haulbrook v. Michelin N. Am., 252 F.3d 696, 702 (4th Cir. 2001).

11

proceeded to slowly get up off the floor and had a dazed, pain [sic] look on his face."

Of course, Pugh does not concede the truth of these facts. Rather, Pugh maintains that Raynor suffered no more than "mild abrasions on [his] face and cheeks." Appellee's Br. at 6. Pugh contends that, to the extent Raynor does suffer chronic back pain, it is attributable to a 2005 accident. Pugh also points to the lack of written complaints about back pain from Raynor in the first seven months following the assault, suggesting that Raynor began concocting a written record of this pain only after he filed his § 1983 complaint in August 2013. A fact finder might ultimately agree with Pugh, but Raynor has offered contrary evidence as to material facts concerning the seriousness of his injury which, at present, preclude the grant of summary judge to Pugh on this prong.

Similarly, as for the subjective inquiry -- whether Pugh acted with deliberate indifference -- Raynor has also offered evidence preventing the grant of summary judgment.[3] In his

---

[3] Part and parcel of our review of the district court's grant of summary judgment is Raynor's claim that the court improperly disregarded most of Raynor's evidence. We agree that the court erred in doing so. For example, in assessing the deliberate-indifference prong, the court ignored Raynor's factual assertions about Mullins' comments, concluding that "nothing in plaintiff's evidentiary submissions [] show[s] that Pugh knew that Mullins posed a risk to plaintiff's health or safety." The court then stated that, "[i]n fact, Pugh stated (Continued)

12

verified complaint, Raynor alleges two independent grounds for establishing Pugh's subjective knowledge of the risk of assault. First, in his verified complaint, Raynor alleges that Mullins told Pugh he was going to attack Raynor and that Pugh responded that he did not care what Mullins did. This allegation, taken as true, establishes that Pugh had "actual knowledge of an excessive risk to the plaintiff's safety." Danser, 772 F.3d at 347; see e.g., Weiss v. Cooley, 230 F.3d 1027, 1032 (7th Cir. 2000); Street v. Corr. Corp. of America, 102 F.3d 810, 815-16 (6th Cir. 1996).

Independent of this fact, Raynor also alleges that Pugh had actual knowledge of the attack as it was happening because Pugh watched the entire incident. Because he did so without radioing for assistance or taking any other action, in Raynor's view Pugh did not respond reasonably to the substantial risk to Raynor's safety. The witnessing inmate's affidavit corroborates Raynor's allegations, stating that during the assault Pugh stood watching

---

that the plaintiff had never mentioned having any problems with Mullins, and that the two men 'got along well'" -- apparently crediting only Pugh's factual assertions while ignoring Raynor's. But, of course, the nonmoving party is entitled "to have . . . his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, [and] the most favorable of possible alternative inferences from it drawn in his behalf." Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).

13

"behind the first set of chase doors smil[ing] with a two way radio in his hand . . . which he never used."

Pugh again disputes this version of events. He asserts that he was outside of the housing unit during the assault and saw no part of it. But where "affidavits present conflicting versions of the facts which require credibility determinations," summary judgment cannot lie. Davis, 600 F.2d at 459-60 (reversing summary judgment where inmate alleged that "the guard watched the knifing attack without acting to protect him," but the guard claimed he was not present); see also Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987).[4]

In sum, genuine disputes of material fact underlie both prongs of Raynor's claim. See Anderson, 477 U.S. at 248 (explaining that factual disputes are "genuine" "if the evidence is such that a reasonable jury could return a verdict for the

---

[4] These factual disputes also defeat Pugh's claim to qualified immunity at this early stage, for Raynor has alleged facts that make out a violation of a clearly established constitutional right. See Pearson v. Callahan, 555 U.S. 223, 232 (2009). Long before this 2013 attack, we had specifically determined that a prison official who passively watches an inmate assault without taking any action in response "violates the rights of the victim inmate." Odom, 349 F.3d at 773; see also, e.g., Winfield, 106 F.3d at 532; Brown v. N.C. Dep't of Corr., 612 F.3d 720, 723 (4th Cir. 2010); Davis v. Zahradnick, 600 F.2d 458, 459-60 (4th Cir. 1979); Gordon v. Leeke, 574 F.2d 1147, 1152 (4th Cir. 1978).

14

nonmoving party"). Thus, on this record, the district court erred in granting summary judgment to Pugh.[5]

IV.

For the forgoing reasons, we vacate the judgment of the district court and remand the case for further proceedings consistent with this opinion.

VACATED AND REMANDED

---

[5] Raynor also argues that the district court erred in denying him any discovery. Generally, a court should not grant summary judgment when, as here, outstanding discovery requests on material issues exist. See Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 196-97 (4th Cir. 2006). The district court stayed Raynor's discovery requests pending resolution of Pugh's qualified immunity defense, in accord with Crawford-El v. Britton. See 523 U.S. 574, 598 (1998). But, without ruling on the (meritless at this stage) qualified immunity claim, the court granted summary judgment on evidentiary grounds, faulting Raynor for "not provid[ing] any evidence, other than his own affidavit, to support his allegations." In so doing, the court erred. On remand the district court should permit appropriate discovery before entertaining any additional motions for summary judgment.

15

BARBARA MILANO KEENAN, Circuit Judge, concurring in part and concurring in the judgment:

I agree with the majority's conclusion that the district court erred because Raynor should have been afforded an opportunity to conduct discovery, and because a genuine dispute exists regarding whether Pugh acted with a culpable state of mind. I write separately to state my view that given Raynor's complex medical history and his improper reliance on lay causation opinion, he has not yet raised a genuine dispute regarding the cause of his alleged injury. Nevertheless, because that defect may be remedied during the course of future discovery in this case, Raynor is entitled to have the district court's summary judgment award vacated.

I do not think that a reasonable jury could conclude from the present record that Mullins' attack, rather than other factors, caused Raynor's alleged back injury. Raynor's complex medical history includes seizures, cardiovascular issues, and a back impairment that existed long before the attack. Prior to that event, Raynor had fallen multiple times, seeking medical treatment for his back pain. Moreover, various medical reports both before and after the attack describe Raynor's back condition as being "degenerative" in nature.

A nonmoving party seeking to prevent summary judgment must show a genuine dispute of fact using admissible evidence, not

16

merely conclusory or speculative statements. See Fed. R. Civ. P. 56(c). Raynor's own interpretation of his x-ray reports, and his speculation regarding the causes of his back pain and his falls after the attack, constitute conclusory and inadmissible lay opinion on issues requiring "scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c). A layperson could not determine whether the "multilevel spondylosis" and the "facet arthropathy" described in a post-attack report differs from the "multilevel lower lumbar facet arthrosis" and the "spondylosis" described in pre-attack reports. Thus, without expert testimony, a lay juror would be unable to determine whether any change in Raynor's spinal condition was attributable to Mullins' attack.

Although, in many cases, an inference of causation may be drawn based on temporal proximity between violent contact and a particular injury, such an inference is unavailable here. Raynor's medical history is sufficiently complex that a lay juror could not rationally infer the cause of his existing back problems. Unlike an injury that appears immediately following a violent impact, Raynor's degenerative spinal condition existed before the attack and worsened after multiple falls during the seven months following the attack. Nothing in the record indicates that this type of spinal condition can be caused by acute physical trauma.

Nevertheless, evidence revealed during future discovery may yet establish material facts supporting Raynor's claim of causation. Therefore, I respectfully concur in the judgment in this appeal.