PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-7680

PAUL CLEVELAND THOMPSON, JR.,

Plaintiff – Appellant,

v.

COMMONWEALTH OF VIRGINIA; CAPTAIN DOLAN; LT. R. THOMPSON; GRIEVANCE COORDINATOR SEAY; BLACKWELL; WARE; LEWIS; BASKERVILLE; JENNINGS; WHITE; CORRECTIONAL OFFICER COOPER; CORRECTIONAL OFFICER DIMING; VIRGINIA DEPARTMENT OF CORRECTIONS, sued in their official and individual capacities,

Defendant – Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Rebecca Beach Smith, Chief District Judge. (2:12-cv-00209-RBS-TEM)

Argued: September 15, 2017                    Decided: December 18, 2017

Before GREGORY, Chief Judge, WYNN, and DIAZ, Circuit Judges.

Affirmed in part, reversed in part, and remanded with instructions by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Wynn and Judge Diaz joined.

**ARGUED:** Emily S. Mordecai, Joshua K. Day, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Trevor Stephen Cox, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF:** Stephen L. Braga, Appellate Litigation Clinic, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant.

Mark R. Herring, Attorney General, Stuart A. Raphael, Solicitor General, Matthew R. McGuire, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

GREGORY, Chief Judge:

Paul Thompson, an inmate of the Virginia Department of Corrections ("VDOC"), brings claims under 42 U.S.C. § 1983, alleging violations of his rights under the First Amendment, Eighth Amendment, and the Fourteenth Amendment by several current and former VDOC officials. He also alleges violations of his rights under the Virginia Constitution by the Commonwealth of Virginia, the VDOC, and those same officials. Claims primarily stem from alleged retaliation by prison officials against Mr. Thompson for filing grievances and lawsuits, most notably by giving him a "rough ride" in a prison van. The district court below granted summary judgment in favor of the defendants on all claims, relying in part on the doctrine of qualified immunity. We now affirm in part, reverse in part, and remand for further proceedings.

I.

At all relevant times, Appellant Mr. Paul C. Thompson[1] was an inmate at Deep Meadow Correctional Center ("DMCC"), which is run by the VDOC. The case largely centers on whether two correctional officers, Officer Cooper and Officer Diming, gave Mr. Thompson a so-called "rough ride" while transporting him in a van and whether other corrections officials responded inappropriately to the incident.

At around 7 a.m. on April 8, 2010, DMCC began transporting Mr. Thompson to attend a 9:30 a.m. proceeding at the Mecklenburg Circuit Court. Before departure,

---

[1] We refer to Appellant Thompson as Mr. Thompson throughout in order to distinguish him from VDOC official, Lt. R. Thompson (no relation).

3

Officers Diming and Cooper secured Mr. Thompson in handcuffs, leg irons, a belly chain, and a black box.[2]

Diming and Cooper then placed Mr. Thompson in the second row of a van, which was equipped with seatbelts. According to Mr. Thompson, neither officer secured Mr. Thompson's seatbelt, even though his restraints prevented him from doing so himself. Mr. Thompson then specifically requested that his seatbelt be secured, but both Cooper and Diming refused. Cooper and Diming each averred that it was their usual practice to fasten inmates' seatbelts and that they would not refuse seatbelt requests. However, neither officer recalled whether Mr. Thompson in fact had his seatbelt fastened or even made such a request.

Once Mr. Thompson was in the van, Cooper took the wheel, with Diming in the passenger seat. They drove without incident, despite going on windy, sharply-curved roads, for about an hour and a half. By Mr. Thompson's account, the van then made a short stop at a convenience store and turned back around in the direction of DMCC. According to Cooper and Diming, they made no stops during the trip and began the return trip after receiving a phone call from DMCC that the court proceeding had been cancelled.

---

[2] "A 'black box' is a hard plastic box placed over the lock apparatus that runs between the prisoner's handcuffs which make it more difficult for a prisoner to tamper with his handcuffs. A chain runs through the box and encircles the prisoner's waist. The chain is tightened and then locked in back so that the prisoner's hands, restrained by handcuffs and the black box, are pulled against his stomach." *Peoples v. Davis*, No. Civ. A. No. 08-252, 2009 WL 349171, at *2 (D.S.C. Feb. 10, 2009).

What happened on the return trip is vigorously disputed. According to Mr. Thompson, the officers intentionally drove the van in a way that caused him to be thrown around the cabin, and they took pleasure in doing so. Cooper reportedly drove erratically, exceeding the speed limit and crossing the white and yellow traffic lines. Because of Cooper's excessive speed on the curved roads and the fact that Mr. Thompson was not belted to his seat, Mr. Thompson was thrown around in the van from one side to the other. The sudden stops and accelerations also caused Mr. Thompson to be thrown forwards and backwards. Meanwhile, Mr. Thompson's restraints prevented him from protecting himself from slamming against the walls of the van. As a result, Mr. Thompson's head and upper body struck the steel mesh covering the windows, causing bleeding and bruising on his forehead, hands, and arms. Mr. Thompson repeatedly asked Cooper to slow down and to drive carefully, informing both officers that he was getting hurt. Mr. Thompson also specifically asked Diming to intervene. However, Diming did not take any action, even after Mr. Thompson had already sustained visible injuries.

In response to Mr. Thompson's pleas, Cooper and Diming reportedly laughed and taunted him. They said, "So you like to write grievances and take people to court, we know how to deal with inmates . . . who create problems." J.A. 476. Since Mr. Thompson's first arrival at DMCC less than six months earlier, he had filed at least 14 complaints, primarily concerning access to the law library and to the notary.

Cooper and Diming joked about how scared Mr. Thompson looked and stated that they were going to make his stay at DMCC a nightmare. Cooper eventually began

5

driving normally again. At some point, Diming called staff at DMCC, stating that Mr. Thompson was banging his own head and being crazy.

Cooper and Diming, unsurprisingly, recounted an entirely different version of events. By their telling, Cooper obeyed all traffic laws. When they were twenty minutes away from DMCC, Mr. Thompson started yelling, shouting profanities, and banging his head on the metal mesh. Mr. Thompson then threatened the officers with lawsuits, saying that he was going to claim they beat him up. Diming called the lieutenant on duty at DMCC, Lt. Thompson, and reported Mr. Thompson's behavior.

Lt. Thompson reported that he heard Mr. Thompson screaming and yelling on speaker-phone during the call. Another officer, K. James, stated that he heard, because the call was on speaker-phone, Mr. Thompson yelling, "I am going to tell them you beat me up," as well as thuds consistent with a head striking a window. J.A. 230.

Mr. Thompson's physical injuries were documented after the ride. Photos were taken, and Lt. Thompson observed a cut that appeared to be a half to three-quarters of an inch long on Mr. Thompson's forehead. An injury report prepared by Cooper and Diming indicated that Mr. Thompson's gash was cleaned and dressed, with no follow-up treatment prescribed.

Mr. Thompson was referred to the prison psychologist for a mental health evaluation. The psychologist, D. Lipscomb, observed Mr. Thompson crying as he recounted the morning's events. Mr. Thompson reportedly expressed concern for his safety, said that he was "scared now[,]" because "they cause[d] [him] to bang [his] head," and that the officers told him, "This will teach you to write grievances . . . [and] file

6

litigation." J.A. 451. According to the mental health report, Mr. Thompson also stated, "Don't know if I can do this. Shouldn't have to go through this shit. Now fucking crying like a freaking baby." J.A. 451.

Lt. Thompson issued a disciplinary charge against Mr. Thompson for "lying and giving false information to an employee," specifically for claiming that staff had assaulted him when his injuries were self-inflicted. J.A. 74, 212–214, 513. This resulted in pre-hearing detention, a disciplinary hearing before Hearing Officer Blackwell, and seven days' isolation time (credited by pre-hearing detention).

In addition to the "rough ride," Mr. Thompson also generally alleges that VDOC officials, including Grievance Coordinator Seay, Assistant Warden Jennings, Ombudsman White, and Major Lewis have denied him access to grievance procedures and to the law library and have rejected grievances without sufficient explanation or after excessive delay.

In 2012, Mr. Thompson, acting *pro se*, filed a 42 U.S.C. § 1983 action in the Eastern District of Virginia, alleging violations of the First Amendment, Eighth Amendment, Fourteenth Amendment, and the Virginia Constitution. The suit named the Commonwealth of Virginia, the Virginia Department of Corrections, Warden Baskerville, Assistant Warden Jennings, Ombudsman White, Major Lewis, Captain Dolan, Lt. Thompson, Grievance Coordinator Seay, Operations Officer Ware, Hearing Officer Blackwell, and Officers Cooper and Diming.

## II.

For clarity, we adopt Mr. Thompson's summary of his claims, as referenced by the district court:

> Claim One. Defendants named are Baskerville, Jennings, Ware, Lewis, Dolan, Thompson, Seay, Blackwell, White, Cooper and Diming. This is a First Amendment retaliation claim. This claim encompasses more than the transport incident on April 8, 2010, it involves Defendants' actions/inactions prior to and after the transport;
>
> Claim Two. Defendants named are Jennings, Dolan, Thompson, Cooper and Diming. This is an Eighth Amendment cruel and unusual punishment claim, that relates directly to the transport incident on April 8, 2010;
>
> Claim Three. Defendants named are Jennings, Dolan, Thompson, Cooper, Diming, Lewis, Seay and Blackwell. This is a Fourteenth Amendment claim involving violations of due process concerning the issuance of a false charge, the hearing process, confinement in segregation, extended confinement in segregation and conspiracy to cover up First and Eighth Amendment violations;
>
> Claim Four. Defendants named are Baskerville, Jennings, Ware, Lewis, Dolan and White. This is a supervisory responsibility direct involvement claim related to First, Eighth and Fourteenth Amendment violations;
>
> Claim Five. Defendants named are Commonwealth of Virginia, VDOC, Baskerville, Jennings, Ware, Lewis, Dolan, Thompson, Seay, Blackwell, White, Cooper and Diming. This is an Article I, Section 12, Virginia Constitution violation involving harassment and retaliation for Plaintiff exercising his First Amendment right;
>
> Claim Six. Defendants named are Commonwealth of Virginia, VDOC, Jennings, Dolan, Thompson, Cooper, and Diming. This is an Article I, Section 9, Virginia Constitution violation related to the transport incident on April 8, 2010; and
>
> Claim Seven. Defendants named are Commonwealth of Virginia, VDOC, Jennings, Seay, Blackwell, Dolan, Thompson, Lewis, Cooper and Diming. This is an Article I, Section 11, Virginia Constitution violation involving due process violations concerning the issuance of a false charge, hearing process, confinement in segregation, extended confinement in segregation

8

and conspiracy to cover up First and Eighth Amendment violations violating the Fourteenth Amendment.

*Thompson v. Dolan*, Civ. A. No. 12-209, 2015 WL 13065640, at *1 (E.D. Va. Aug. 10, 2015). The district court granted summary judgment on all seven claims in favor of all defendants.

This court reviews a grant of summary judgment *de novo*. *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). We ask "whether any genuine issues of material fact exist for the jury and if not, whether the district court erred in applying the substantive law." *Id.* In doing so, we "view the evidence in the light most favorable to the nonmoving party." *Id.* "To survive summary judgment, 'there must be evidence on which the jury could reasonably find for the [nonmovant].'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

For the reasons below, we affirm the grant of summary judgment as to Claims Three and Four but reverse in part as to Claims One, Two, Five, Six, and Seven. Because Claim Two's Eighth Amendment claim goes directly to the transport incident and is the factual epicenter of this case, we address that claim first.

III.

A.

The district court granted summary judgment as to Mr. Thompson's Eighth Amendment claim on qualified immunity grounds. To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make

9

out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct.[3] *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009) (modifying *Saucier v. Katz*, 533 U.S. 194 (2001)).  The analysis takes place against the backdrop of two dueling interests:  "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 231; *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017).

As to the merits prong of the qualified immunity analysis, Mr. Thompson must show a violation of the Eighth Amendment.  The Eighth Amendment protects prisoners from "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).  That protection imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates." *Whitley v. Albers*, 475 U.S. 312, 319–20 (1986).  However, not all Eighth Amendment violations are the same: some constitute "deliberate indifference," while others constitute "excessive force." *Id.* at 319–20.

The deliberate indifference standard generally applies to cases alleging failures to safeguard the inmate's health and safety, including failing to protect inmates from attack,

---

[3] Courts, including the Fourth Circuit, have pointed out a "special problem" that arises when applying the qualified immunity analysis in an Eighth Amendment case. Appellees' Br. at 19.  Specifically, some courts skip the "clearly established" prong entirely upon finding deliberate indifference, because an officer's knowing violation of the law is *per se* unreasonable. *See Cox v. Quinn*, 828 F.3d 227, 238, n.4 (4th Cir. 2016) (raising issue and summarizing other courts' approaches but declining to decide issue). However, as in *Cox*, we do not need to reach this issue because we hold that the clearly established prong is satisfied.

maintaining inhumane conditions of confinement, or failing to render medical assistance. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). The deliberate indifference standard is a two-pronged test: (1) the prisoner must be exposed to "a substantial risk of serious harm," and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety. *Farmer*, 511 U.S. at 834, 837–38. In excessive force cases, on the other hand, courts must determine "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992).

To properly evaluate a prisoner's Eighth Amendment claim, courts ordinarily must choose which standard to apply as to each defendant. The two standards differ significantly, and importantly, deliberate indifference is not always easier to prove than excessive force. While excessive force does require malicious intent, it does not require that the prisoner victim suffer a "significant injury." *McMillian*, 503 U.S. at 9–10 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated."). Therefore, a prisoner who suffers a minor, but malicious, injury may be able to prevail on an excessive force claim but not on a deliberate indifference claim.

Under the second prong of qualified immunity, even if an official has violated an inmate's constitutional right, he is still entitled to immunity if the right was not so "clearly established" that "a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citing *Anderson v.*

11

*Creighton*, 483 U.S. 635, 640 (1987)). Ultimately, our inquiry is whether "the state of the law [at the time of alleged conduct] gave fair warning that [the officer's] alleged treatment [of the prisoner] was unconstitutional." *Id.* at 741.

To determine if the right in question was clearly established, we first look to cases from the Supreme Court, this Court of Appeals, or the highest court of the state in which the action arose. *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point, binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." *Booker*, 855 F.3d at 543; *Owens*, 372 F.3d at 279 ("[T]he absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity.").

Courts must take care to define the right at an "appropriate level of specificity." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). Ordinarily, "the unlawfulness [of government conduct] must be apparent" "in the light of pre-existing law." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citing *Creighton*, 483 U.S. at 640); *Safar v. Tingle*, 859 F.3d 241, 246 (4th Cir. 2017) (noting that court must identify precedent with sufficiently "similar circumstances" in order to find law is clearly established). However, a "general constitutional rule . . . may apply with obvious clarity . . . even though the very action in question has not previously been held unlawful." *Hope*, 536 U.S. at 741 (citing *United States v. Lanier*, 520 U.S. 259, 271 (1997)). Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at

12

741 (noting that prior cases need not have "fundamentally similar" or even "materially similar" facts).

B.

Mr. Thompson brings his Eighth Amendment claim against Officers Cooper and Diming, Lt. Thompson, Assistant Warden Jennings, and Captain Dolan. Only Cooper and Diming were directly involved in the transport incident as the driver and the occupant of the passenger seat, respectively. Mr. Thompson's complaint against Lt. Thompson, Jennings, and Dolan sounds in supervisory liability, alleging failures to ensure safe transport and adherence to VDOC procedures. The district court granted summary judgment in favor of all five defendants after finding that Mr. Thompson's right was not clearly established. Because we find that Mr. Thompson has shown facts making out a violation of a clearly established right, we now reverse summary judgment and remand as to Officers Cooper and Diming. However, because Mr. Thompson has not shown sufficient facts for supervisory liability, we affirm the grant of summary judgment in favor of Lt. Thompson, Jennings, and Dolan.

1.

We first address whether Officer Cooper, the driver of the van, is entitled to qualified immunity under the two-step framework. We conclude (1) that Mr. Thompson has presented sufficient facts for a reasonable jury to find that Cooper used excessive force in violation of the Eighth Amendment and (2) that Mr. Thompson's right not to be subjected to such force was clearly established by April 8, 2010, the date of the incident.

13

a.

Although the district court seemed to assume without expressly deciding that deliberate indifference was the correct standard to apply to Cooper's alleged Eighth Amendment violation, *McMillian* requires application of the excessive force standard in this case. *See* 503 U.S. at 6–7. *McMillian* held that the excessive force standard applied to an officer who punched an inmate during transport for no apparent reason. *See id.* at 4, 6–7. Mr. Thompson essentially claims that Cooper applied force against him without any legitimate purpose, albeit using the transport van's momentum rather than a punch. Those facts do not materially distinguish *McMillian*. *See id.* Accordingly, we must determine whether, viewing the evidence in light most favorable to Mr. Thompson, Officer Cooper used force "maliciously and sadistically to cause harm." *Id.*

We evaluate whether Cooper acted maliciously or "wantonly" by applying a non-exclusive, four-factor balancing test:

    (1) the need for the application of force;
    (2) the relationship between the need and the amount of force that was used;
    (3) the extent of any reasonably perceived threat that the application of
        force was intended to quell; and
    (4) any efforts made to temper the severity of a forceful response.

*Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008) (citing *Whitley*, 475 U.S. at 321). In *Iko* we applied these factors to hold that a prison official used excessive force in violation of the Eighth Amendment by applying pepper spray while removing an inmate from his cell because the official continued to spray even after the inmate attempted to comply. 535 F.3d at 239–40, 243. As discussed below, at least three of the four factors require a similar conclusion here.

14

First, Officer Cooper never needed to use force on Mr. Thompson during the transport. Unlike Iko, who initially refused to leave his cell as ordered, Mr. Thompson did not disobey any instruction. In fact, the parties do not dispute that Mr. Thompson fully complied with all instructions at all times leading up to the alleged use of force. *See id.* at 231, 239–40. Moreover, there is no indication in the record that any use of force against Mr. Thompson during transport was justified. Accordingly, a reasonable jury could credit Mr. Thompson's affidavit and find that Officers Cooper and Diming's intent was malicious—to teach him a lesson for filing grievances. Such a motive, unsupported by any penological interest, is clearly not a legitimate basis for using force.

Second, because there was no need to use force, the force used was necessarily excessive in relation to the need. In *Iko*, we held that the official's use of force became disproportionate once the prisoner began showing signs of compliance. 535 F.3d at 239–40. Here, since there was never a need, the use of force was disproportionate from start to finish. Moreover, even if Mr. Thompson disobeyed instructions, giving a prisoner a so-called "rough ride" in a van does not constitute an acceptable means of securing compliance. *Cf. id.* at 239 (noting that officers are trained to use pepper spray and that pepper spray is allowed for purposes of removing inmates under department's Use of Force Directive). To use force in this manner is a peculiarly cruel means of punishment, as a "rough ride" is designed to place the victim in fear for his life. Not only is the prisoner not able to protect himself, but motor vehicles, unlike a controlled spray or direct applications of force, are not designed for use as a means of securing compliance or otherwise subduing a prisoner. The momentum from the van is not susceptible to precise

15

calibration such that only the amount of force justified by the circumstances is actually deployed. The prospect that neither the victim nor the officer can prevent an instantaneous escalation to a life-or-death situation instills terror. A "rough ride" therefore bears no relationship to any penological need to use force, and even standing alone, its sheer cruelty and impropriety suggest a constitutional violation.

Third, Officers Cooper and Diming do not even assert that Mr. Thompson posed a threat to anyone. In *Iko*, the prisoner posed a minimal threat—he had even lain down on the ground before the officer sprayed him the final time. *Id*. Here, the officers do not, and cannot, argue that Mr. Thompson presented any kind of physical threat, as he was fully restrained with shackles, handcuffs, and a black box. Moreover, he never verbally threatened the officers with violence and was never hostile in any way. Mr. Thompson's only threat, the officers concede, was the threat of future litigation.

Finally, the fourth factor, concerning efforts to temper the use of force, is a draw at best. In contrast to *Iko*, where prison officials failed to provide any medical attention after applying the pepper spray, Cooper and Diming did secure medical assistance upon their return to DMCC. But, they never secured Mr. Thompson's seatbelt, even after he was injured, and they fueled Mr. Thompson's fear for his safety by taunting and threatening him. Even assuming this factor weighs in the government's favor, it alone cannot preclude the conclusion that Mr. Thompson has alleged a constitutional violation. To hold otherwise would allow prison officials to escape liability in excessive force cases simply by rendering medical assistance after the fact.

16

The extent of Mr. Thompson's injury is not one of the relevant factors and does not, contrary to the government's suggestion, preclude a violation of the Eighth Amendment. Of course, the Eighth Amendment does not prohibit a *de minimis* use of force that is not itself "repugnant to the conscience of mankind." *McMillian*, 503 U.S. at 9–10 (citing *Whitley*, 475 U.S. at 327). But when use of force is malicious or repugnant, a plaintiff need not suffer anything significant to establish an excessive force claim. Thus, in *McMillian*, the Supreme Court reversed the Fifth Circuit for rejecting an excessive force claim solely because the inmate had not suffered a "significant injury." 503 U.S. at 4–5. The Court explained:

> When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. *This is true whether or not significant injury is evident.* Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury. Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today.

*Id.* at 9–10 (citing *Whitley*, 475 U.S. at 327; *Estelle*, 429 U.S. at 102) (emphasis added). The excessive force analysis thus focuses on the maliciousness of the force used, not the severity of the injury that results from that force. *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). Here, the momentum from the van was sufficient to cause a gash on Mr. Thompson's forehead, bleeding from his hands and arms and bruising, not to mention significant emotional distress. The force alleged is therefore beyond *de minimis* for Eighth Amendment purposes. *See id.* at 9 (force not *de minimis* when sufficient to

17

cause bruising, swelling, loosened teeth); *see also Wilkins*, 559 U.S. at 35, 40 (force sufficient to cause bruising, lower back pain, migraines, dizziness, and mental anguish not *de minimis*).

The cases cited by the government and the district court do not support a contrary holding. For example, *Jabbar v. Fischer* merely held that failure to provide inmates with seatbelts, "standing alone," is not an Eighth Amendment violation. *See* 683 F.3d 54, 57 (2d Cir. 2012) (noting no intent to punish and distinguishing reckless-driving case). Other cases are similarly inapplicable because their facts do not involve a prison official acting with malicious intent. *See Spencer v. Knapheide Truck Equipment Co.*, 183 F.3d 902, 907–08 (8th Cir. 1999) (no evidence suggesting intent to punish); *Carrasquillo v. City of New York*, 324 F. Supp. 2d 428, 436 (S.D.N.Y. 2004) (car accident due to negligence); *Cooks v. Crain*, 327 F. App'x 493, 493 (5th Cir. 2009) (general failure to install seatbelts on transport vehicles); *Smith v. Sec'y For Dep't of Corr.*, 252 F. App'x 301, 303–04 (11th Cir. 2007) (failure to seatbelt without dangerous driving); *Dexter v. Ford Motor Co.*, 92 F. App'x 637, 640–41 (10th Cir. 2004) (failure to seatbelt standing alone); *Vinson v. U.S. Marshals Serv.*, Civ. A. No. 10-79, 2011 WL 3903199, at *5 (D.S.C. Sept. 2, 2011) (negligent driving and failure to seatbelt do not rise to Eighth Amendment violation), *aff'd*, 459 F. App'x 221 (4th Cir. 2011); *Young v. Dep't of Corr.*, Civ. A. No. 04-10309, 2007 WL 2214520, at *6 (E.D. Mich. July 27, 2007) (no evidence of intent to injure or punish); *Jones v. Collins*, Civ. A. No. 05-663, 2006 WL 1528882, at *2 (S.D. Ill. June 1, 2006) (negligent failure to secure seatbelt).

18

Because Mr. Thompson has alleged facts from which a reasonable factfinder could conclude that Officer Cooper maliciously subjected him to a rough ride, he has sufficiently alleged an Eighth Amendment excessive force claim sufficient to survive summary judgment as to Cooper.

b.

We further hold that Mr. Thompson's right was clearly established by April 8, 2010, the date of the incident. Defined at the appropriate level of specificity, prisoners have a right not to be assaulted by their captors. Under the Eighth Amendment, prisoners have the right to be free from malicious or penologically unjustified infliction of pain and suffering. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) ("Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'") (citing *Gregg v. Georgia*, 428 U.S. 153, 183 (1976); *Estelle*, 429 U.S. at 103). This principle applies with particular force when inmates have not engaged in wrongdoing, are restrained and compliant and posing no physical threat. Further, no reasonable officer would think that violently tossing a prisoner around in a moving vehicle is an acceptable means of punishment even if the prisoner had engaged in wrongdoing. After examining both controlling and persuasive authority, we conclude that Officer Cooper had fair warning that gratuitously giving an inmate a "rough ride" for no reason other than to retaliate against him for filing lawsuits and grievances is unconstitutional.

A reasonable officer would have known from Supreme Court precedent that the Eighth Amendment prohibits such malicious acts of violence or intentional endangerment. In *McMillian*, one of the seminal cases defining the scope of the right not

19

to be subjected to excessive force, the Supreme Court reversed the dismissal of an Eighth Amendment claim based on a correctional officer's gratuitous punch of an inmate during transport. *See* 503 U.S. at 4, 12. In *Wilkins*, a prison official, angered by the prisoner's request for a grievance form, slammed the prisoner against the ground and physically beat him in response. 559 U.S. at 35, 37 (citing and reaffirming *McMillian*, 503 U.S. at 9). The Supreme Court reversed the district court's dismissal of the case for failure to state a claim and held that the prisoner would prevail if he proved that the official had in fact acted maliciously. *See id.* at 40. As in *Wilkins*, if we credit Mr. Thompson's account, the only reason Cooper used force against him was in retaliation for filing grievances. Accordingly, *Wilkins* and *McMillian* are sufficiently similar to Cooper's alleged conduct that a reasonable officer would have known that a retaliatory "rough ride" is unconstitutional.

To be sure, *McMillian* and *Wilkins* involved direct punches and kicks, rather than a "rough ride," but it makes no difference to the constitutional analysis whether Mr. Thompson was slammed against the side of the van by the officer's hands or by the momentum maliciously created by the officer's driving. *See Brown v. Fortner*, 518 F.3d 552, 560–62 (8th Cir. 2008) (holding that prisoner's right not to be endangered by dangerous driving while unbuckled was clearly established despite lack of published authority on those specific facts). The intentionally erratic driving was simply a different means of effectuating the same constitutional violation. To draw a line between these acts would encourage bad actors to invent creative and novel means of using unjustified force on prisoners. Although *McMillian* and *Wilkins* did not reach the qualified

20

immunity question, their holdings provide officers with fair notice that malicious, unprovoked, unjustified force inflicted on inmates who are compliant and restrained, and violates the Eighth Amendment. In other words, the Eighth Amendment principle prohibiting such gratuitous violence applies with "obvious clarity" to a malicious "rough ride," just as it does to a malicious direct blow. *See Hope*, 536 U.S. at 741.

Indeed, two Eighth Circuit cases have held that malicious "rough rides" violate the Eighth Amendment. *See Fortner*, 518 F.3d at 560–62; *Brown v. Morgan*, 39 F.3d 1184, *1 (8th Cir. 1994) (unpublished). Although these cases applied the deliberate indifference standard, they provided notice to Cooper, because deliberate indifference has a lower intent requirement, and, as discussed *infra*, the injuries here suffice for a deliberate indifference claim. *Fortner* and *Morgan* both involved officers who knowingly refused to fasten a prisoner's seatbelt, drove recklessly, and refused the prisoner's pleas to slow down. *See Fortner*, 518 F.3d at 556, 560–62 (denying qualified immunity); *Morgan*, 39 F.3d at *1 (finding deliberate indifference). In *Fortner*, the prisoner, like Mr. Thompson, was fully shackled with chains, handcuffs, and a black box such that he could not secure his own seatbelt or brace himself if necessary. *Id.* The driver ignored the prisoner's pleas to stop speeding and eventually caused a car accident. *Id.* Here, Cooper apparently speeded around curves and crossed white and yellow traffic lines, generating enough force to bruise and injure Mr. Thompson.[4] Mr. Thompson not

---

[4] Appellees argue that Mr. Thompson's allegations of reckless driving are too conclusory to be considered. Appellees' Br. at 28. However, they are virtually identical

only asked Cooper to slow down, as Brown did in *Fortner*, but also indicated that he had already been injured. Similarly, in *Morgan*, the driver took pleasure in the prisoner's fear and asked, "Are you scared?" before increasing his speed. 39 F.3d at *1. In Mr. Thompson's case, Cooper laughed at him and taunted him for being scared, before stating his intent to teach him a lesson. Cooper's conduct therefore went even further than what was considered unacceptable in *Fortner* and *Morgan*, as Cooper not only disregarded a serious risk of harm, but apparently intended such harm to result. *See Whitley*, 475 U.S. at 320 (suggesting that malicious intent is more culpable than mere indifference by limiting liability to intentional misconduct). Given the factual parallels, the Eighth Circuit cases are powerful indicators that the officers here had fair notice. *Cf. Pauly*, 137 S. Ct. at 552 (reversing denial of qualified immunity because court failed to identify case with similar circumstances and no general principle applies with obvious clarity).

Although few circuits have addressed specifically an officer's use of a vehicle to injure an inmate, there is a clear consensus among the circuits, including the Fourth, that infliction of pain and suffering without penological justification violates the Eighth Amendment in an array of contexts. Simply put, there are many ways of physically and maliciously assaulting a helpless prisoner, and all of them violate the Eighth Amendment.

---

to the statements credited by the Eighth Circuit in *Fortner*, and we conclude that they are sufficiently specific here. *See* 518 F.3d at 559.

The First Circuit denied summary judgment as to an excessive force claim against officers who beat a detainee for requesting permission to finish his meal. *Massey v. Rufo*, 14 F.3d 44, \*2–3 (1st Cir. 1994) (unpublished) (reversing summary judgment).

The Second Circuit has held that retaliating against inmates for taking over a prison after order had been restored would violate the Eighth Amendment. *See Blyden v. Mancusi*, 186 F.3d 252, 258–60, 265, n.6 (2d Cir. 1999) (affirming jury instructions to that effect); *Al-Jundi v. Mancusi*, 926 F.2d 235, 240 (2d Cir. 1991). The court has also concluded that handcuffing a prisoner for hours without any apparent reason constitutes an unnecessary infliction of pain. *Johnson v. Testman*, 380 F.3d 691, 698, n.6 (2d Cir. 2004); *see also Powell v. Schriver*, 175 F.3d 107, 115 (2d Cir. 1999) (holding that unnecessary disclosure of prisoner's HIV and transsexual status subjected prisoner to unnecessary risk of harm).

The Third Circuit has held that "[n]o reasonable officer could agree that striking and kicking a subdued, nonresisting inmate in the side . . . was reasonable or necessary under established law." *Giles v. Kearney*, 571 F.3d 318, 326–28 (3d Cir. 2009); *see also McDowell v. Sheerer*, 374 F. App'x 288, 293 (3d Cir. 2010) ("[B]y 2004, it was established that an officer may not . . . use gratuitous force against an inmate who has been subdued.").

This court, in *Iko*, held that using pepper spray on an inmate after he began complying with instructions violated the Eighth Amendment. 535 F.3d at 239–40. Similarly, we have held that the Eighth Amendment prohibits using water hoses, billy clubs, and tear gas against an inmate who was locked in a cell and posed no threat to the

23

prison officials. *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) ("The unjustified striking or beating of a prisoner by police or correctional officials constitutes cruel and unusual punishment which is actionable under 42 U.S.C. § 1983.").

In the words of the Fifth Circuit, "[w]e have little difficulty concluding that in 2009 . . . it was well-established . . . that officers may not 'use gratuitous force against a prisoner who has already been subdued . . . [or] incapacitated.' Reasonable officers had fair notice that [punching and using mace on a non-resisting inmate] violated [the] right to be free from excessive force." *Cowart v. Erwin*, 837 F.3d 444, 449–50, 454–55 (5th Cir. 2016) (holding that law was clearly established as of 2009). The Fifth Circuit also has held that a prison official would "obviously" exceed the protection of qualified immunity if he incentivized other inmates to attack the plaintiff. *See Davis v. Tucker*, 322 F. App'x 369, 370 (5th Cir. 2009) (dismissing claim because inmate had not adduced sufficient evidence to support claim).

Likewise, the Sixth Circuit has "long recognized that a spontaneous assault by a prison guard on an inmate is grounds for an Eighth Amendment excessive force claim." *Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 535, 539–40 (6th Cir. 2015) (clearly established as of 2004); *Pelfrey v. Chambers*, 43 F.3d 1034, 1035, 1037 (6th Cir. 1995) (spontaneously cutting off inmate's hair to scare him and to reinforce dominance violated Eighth Amendment); *Moore v. Holbrook*, 2 F.3d 697, 700–01 (6th Cir. 1993) (inmate's allegations that he was handcuffed and beaten by prison guards would constitute valid Eighth Amendment claim).

24

In the Seventh Circuit, qualified immunity does not protect an officer who strikes an inmate and slams him against a cell for asking a question. *Hill v. Shelander*, 992 F.2d 714, 715, 718–19 (7th Cir. 1993). The court stated in *Hill* that "an unprovoked assault" is not within "the shadow of legal uncertainty." *Id.* (citing *Whitley*, 475 U.S. at 319). The Seventh Circuit has also extended the bar against unnecessary infliction of pain and suffering to strip searches that are conducted solely to harass a prisoner, as well as to intentional, gratuitous denials of medication. *E.g.*, *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828–29 (7th Cir. 2009) (holding that intentionally denying or delaying access to medical care would violate Eighth Amendment); *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (holding that otherwise lawful strip-search becomes unconstitutional if conducted in manner intended to humiliate and cause psychological pain). If a prison guard may not allow an inmate to suffer a deterioration in health condition without any legitimate penological interest, it seems reasonably clear that a prison guard cannot then directly injure and harm an inmate's health and wellbeing through physical force without justification.

The Eighth Circuit has held that intentionally endangering inmates, such as by exposing them to attack by other inmates, as punishment for filing lawsuits is an "appalling" violation of the Eighth Amendment. *Irving v. Dormire*, 519 F.3d 441, 447–48, (8th Cir. 2008).

The Ninth Circuit has held that *McMillian* clearly established a right to be free from unnecessary and wanton infliction of pain and that officers violated this right by beating and using a Taser on a non-resisting inmate, including after he was handcuffed

25

following a disturbance.  *Martinez v. Stanford*, 323 F.3d 1178, 1180, 1183–84 (9th Cir. 2003) (reversing grant of summary judgment).

According to the Tenth Circuit, "an inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards."  *Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993) (case of sexual abuse by prison guard).

Finally, the Eleventh Circuit has held that:

> The law of excessive force in this country is that a prisoner cannot be subjected to gratuitous or disproportionate force that has no object but to inflict pain.  *This is so whether the prisoner is in a cell, prison yard, police car, in handcuffs on the side of the road, or in any other custodial setting.*  The use of force must stop when the need for it to maintain or restore discipline no longer exists.  Long before the defendants acted, the law was clearly established that correctional officers could not use force maliciously or sadistically for the very purpose of causing harm.

*Skrtich v. Thornton*, 280 F.3d 1295, 1304–05 (11th Cir. 2002) (citing *Whitley*, 475 U.S. 320–21) (holding that beating prisoner after he was incapacitated by electric shock constituted excessive force) (emphasis added).

As is apparent from the case law of eleven federal courts of appeals, the Eighth Amendment protection against the malicious and sadistic infliction of pain and suffering applies in a diverse range of factual scenarios.  That unifying thread provides fair notice to prison officials that they cannot, no matter their creativity, maliciously harm a prisoner on a whim or for reasons unrelated to the government's interest in maintaining order.  That principle applies with particular clarity to cases such as this one, where the victim is restrained, compliant, and incapable of resisting or protecting himself, and otherwise presents no physical threat in any way.

26

The government argues, unpersuasively, that the law is not clearly established because courts have not found a constitutional violation in some failure-to-fasten-seatbelt cases, notwithstanding the Eighth Circuit precedent. However, with one exception, every other seatbelt case cited by the district court and the government involved mere negligence, rather than malice or even recklessness. *See, e.g., Jabbar*, 683 F.3d at 57; *Spencer*, 183 F.3d at 907-08; *Crain*, 327 F. App'x at 493; *Smith*, 252 F. App'x at 304; *Dexter*, 92 F. App'x at 640–41. The one exception is *Young*, an unpublished district court case that involved reckless driving. 2007 WL 2214520, at *6. However, *Young* took place before *Fortner* was published, and the district court erred by relying purely on negligence cases without recognizing the heightened risk of reckless or malicious endangerment. *See id.* at 5–6. Moreover, even *Young* distinguished its facts from a case where the driver drives with the intent to scare an inmate or refuses pleas to slow down. *Id.* Instead, all cases that have squarely dealt with intentional misconduct have found an Eighth Amendment violation.

The government also argues, unpersuasively, that an official's wrongful intent is never relevant to the qualified immunity analysis, even in the context of an Eighth Amendment deliberate indifference or excessive force claim. *See* Appellees' Br. at 31. The government cites *Crawford-El v. Britton* for the sweeping proposition that, under *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), "[e]vidence concerning the defendant's subjective intent is simply irrelevant." *Crawford-El v. Britton*, 523 U.S. 574, 589 (1998). *Crawford-El*'s holding is much more limited and is not itself a decision on qualified immunity. *See* 523 U.S. at 589 (holding that plaintiff may pursue ordinary discovery into

27

official's intent for claims having intent element notwithstanding irrelevance of intent to qualified immunity defense). Read in context, the Court was merely referring to and reiterating *Harlow*'s holding that "'bare allegations of malice' cannot overcome the qualified immunity defense." *Id.* (quoting *Harlow*, 457 U.S. at 817–18).

*Crawford-El* and *Harlow* do not forbid us from considering evidence of intent in Mr. Thompson's excessive force claim. *Harlow* did not involve an Eighth Amendment excessive force claim or a deliberate indifference claim. *See* 457 U.S. at 817–18 (suit against presidential aides for recommending plaintiff's firing in bad faith). As *Crawford-El* itself recognized, the significance of evidence of intent differs when it "is an essential component of the plaintiff's affirmative case." *See* 523 U.S. at 588–90.

For claims where intent is an element, an official's state of mind is a reference point by which she can reasonably assess conformity to the law because the case law is intent-specific. Considering evidence of intent in this manner is not foreclosed by *Crawford-El*, as the Supreme Court itself has applied the clearly established prong in reference to retaliatory intent. *See Ortiz v. Jordan*, 562 U.S. 180, 189–91 (2011) (holding that law was clearly established that prison guard cannot retaliate against inmate by putting her in solitary confinement) (citing *Crawford-El*, 523 U.S. at 592).

Thus, in light of the Supreme Court precedent in *McMillian* and *Wilkins*, case law on "rough rides" from our sister circuit, and the overwhelming consensus on the prisoner's right to be free from assault, *i.e.*, malicious infliction of pain and suffering, we conclude that Officer Cooper had fair warning that his actions were unconstitutional and that Mr. Thompson's right was therefore clearly established. Accordingly, we reverse the

28

district court's determination that Officer Cooper is entitled to qualified immunity on the Eighth Amendment excessive force claim.

2.

As to Officer Diming, we agree with the district court that Mr. Thompson has "presented sufficient evidence to create a genuine issue of material fact" as to deliberate indifference but disagree that his right to reasonable protection from assault was not clearly established as of April 8, 2010. *See Thompson*, 2015 WL 13065640, at *8.

a.

Given the differences in the roles that Officer Cooper and Officer Diming played during the van ride, we hold that deliberate indifference is the correct standard to apply to Officer Diming. Mr. Thompson's affidavits show that Diming refused to buckle his seatbelt, ignored his pleas for help, failed to intervene to stop Cooper's unlawful use of force, and instead verbally taunted and harassed him. Unlike Cooper, who drove the van, Diming did not use unlawful force against Mr. Thompson—rather, he failed to do anything to stop it. Accordingly, the claim against Diming is functionally the same as claims in failure-to-protect or conditions-of-confinement cases, which are evaluated under the deliberate indifference standard.[5] *See Farmer*, 511 U.S. at 834; *Wilson*, 501

---

[5] Applying the deliberate indifference standard would also create symmetry with the test used to establish bystander liability, which is similar in principle to what Mr. Thompson alleges against Diming. *See Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002) ("[A]n officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.").

29

U.S. at 303. To survive summary judgment, Mr. Thompson must show facts sufficient for a reasonable factfinder to conclude that (1) he was exposed to a "substantial risk of serious harm" and (2) Diming "kn[ew] of and disregard[ed]" that risk. *Farmer*, 511 U.S. at 834, 837–38.

First, there are sufficient facts for a reasonable jury to conclude that Mr. Thompson was exposed to a "substantial risk of serious harm." An inmate need not show that she in fact suffered serious harm to prevail on this prong because "the Eighth Amendment protects against future harm." *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993). Courts have "plainly recognized that a remedy for unsafe conditions need not await a tragic event." *Id.* Viewing the facts in light most favorable to Mr. Thompson, there was a substantial risk that he would suffer serious harm: he was fully shackled, unable to brace himself for impact, and sitting without a seatbelt, in a vehicle that was speeding and being driven in a way intended to scare and injure him, by a driver who refused both his requests to be seatbelted and to slow down. *See Fortner*, 518 F.3d at 559–60; *Morgan*, 39 F.3d 1184, at *1. In this case, the risk to Mr. Thompson was even greater than the risk involved in *Fortner* and *Morgan*, as neither of the drivers in those cases specifically intended to cause injury.

In arguing to the contrary, the government points to *Vinson*, an unpublished case from the District of South Carolina that involved an unfastened seatbelt and negligent driving. *See* 2011 WL 3903199 (finding no substantial risk of harm). But the court in *Vinson* distinguished its facts from those of *Fortner*, where the Eighth Circuit found an Eighth Amendment violation, because the *Vinson* plaintiff had not alleged reckless

30

driving with specificity, such as by citing speeding and driving over boundary lines. *See Vinson v. U.S. Marshals Serv.*, Civ. A. No. 10-79, 2011 WL 3903057, at *9 (D.S.C. July 29, 2011), *report and recommendation adopted*, 2011 WL 3903199 (D.S.C. Sept. 2, 2011). The plaintiff in *Vinson* made only conclusory statements of recklessness and did not allege that the defendant taunted him or ignored his requests to slow down. *Id.* Because the facts in this case are virtually identical to those that the court in *Vinson* distinguished, *Vinson* cannot support a grant of summary judgment here. Other cases cited by the government and the district court are similarly inapplicable to the facts of this case. *See, e.g.*, *Jabbar*, 683 F.3d at 57 (failure to seatbelt standing alone); *Spencer*, 183 F.3d at 907–08 (no-seatbelt policy and driver without intent to harm); *Crain*, 327 F. App'x at 493 (failure to install seatbelts); *Smith*, 252 F. App'x at 304 (no dangerous driving); *Dexter*, 92 F. App'x at 640–41 (failure to seatbelt standing alone); *Young*, 2007 WL 2214520, at *5–6 (distinguishing cases where driver ignored pleas to stop and had purpose of harming passenger); *Jones* 2006 WL 1528882, at *1 (negligent driving); *Oliver v. Georgia Dep't of Corr.*, Civ. A. No. 06-320, 2006 WL 3086792, at *2 (M.D. Ga. Oct. 27, 2006) (negligence and failure to install seatbelts). In sum, we conclude that *Fortner* and *Morgan* are more persuasive in determining a substantial risk of harm because they bear greater factual similarities to this case. *See Fortner*, 518 F.3d at 559–60; *Morgan*, 39 F.3d 1184, at *1.

Under the second prong of deliberate indifference, we must determine whether Diming subjectively knew of and disregarded the substantial risk of harm to Mr. Thompson. Although this element is subjective, a deliberately indifferent state of mind

31

can be proven through "inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. A prison official is deliberately indifferent if "the official is present at the time of an assault and fails to intervene or otherwise act to end the assault." *Raynor v. Pugh*, 817 F.3d 123, 128 (4th Cir. 2016) (quoting *Williams v. Mueller*, 13 F.3d 1214, 1216 (8th Cir. 1994)). However, prison officials are not liable if taking action would endanger their own lives or if the harm occurred despite their reasonable efforts to prevent it. *Id.*; *Cox*, 828 F.3d at 236. "But 'completely failing to take any action' to stop an ongoing assault on a prisoner can amount to deliberate indifference." *Raynor,* 817 F.3d at 128 (quoting *Winfield v. Bass*, 106 F.3d 525, 532 (4th Cir. 1997) (en banc)); *see Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 773 (4th Cir. 2003) ("[A] correctional officer who stands by as a passive observer and takes no action whatsoever to intervene during an assault violates the [Eighth Amendment] rights of the victim inmate.").

We conclude that a reasonable jury could find that Officer Diming subjectively knew of the serious risk to Mr. Thompson's safety. In *Odom*, this court held that prison officials violated the Eighth Amendment for failing to take any steps to protect an inmate from a known attack. 349 F.3d at 767. There, the court found that the prison officer was aware of the risk that the inmate, Odom, would be attacked because Odom (1) had warned the officer, (2) had pleaded for help as the attack was happening, and (3) was experiencing the attack in the officer's presence. *Id.* Here, Mr. Thompson informed Diming that his seatbelt was unfastened, but Diming ignored the request to buckle it, contrary to his normal practice. In addition, Mr. Thompson informed Diming of his concerns for his safety when Cooper began driving erratically, and Cooper's erratic

32

driving of course took place in Diming's presence. Diming was also demonstrably aware of Mr. Thompson's concerns for his safety, as he apparently mocked him for being scared. While it is unclear whether Diming, Cooper, or both indicated to Mr. Thompson that the "rough ride" was intended to teach him a lesson, one could infer that Diming, at minimum, heard that threat. Diming was also aware that Mr. Thompson had been injured, having called the prison to report that Mr. Thompson had banged his head. These facts lead to the inescapable conclusion that Diming was aware of the risk to Mr. Thompson created by Cooper.

We also conclude that a reasonable jury could find that Diming disregarded a known risk of harm by failing to take any reasonable steps to prevent Mr. Thompson from being hurt. In *Odom*, the officer rejected the inmate's pleas to be let out of the cell where he was being attacked. *Id.* at 767–68. Indeed, he took no action until after the victim had suffered broken ribs. *Id.* In this case, Diming exhibited a similar pattern of disregard in the face of escalating risks to Mr. Thompson's safety. Diming initially dismissed Mr. Thompson's request for a seatbelt. He then dismissed Mr. Thompson's fear of injury and taunted him. Even after Mr. Thompson was visibly injured and began bleeding, Diming took no action, whether to ask Cooper to slow down or to finally secure Mr. Thompson's seatbelt. Moreover, there was nothing that prevented Diming from reasonably taking at least some steps to protect Mr. Thompson. A reasonable factfinder could therefore conclude that Diming was aware of a risk to Mr. Thompson's safety, certainly by the time Mr. Thompson was injured, if not earlier, and that Diming consciously disregarded that risk by failing to intervene. *See Raynor*, 817 F.3d at 128.

33

In sum, viewing the evidence in the light most favorable to Mr. Thompson, he has alleged sufficient facts to satisfy both prongs of the deliberate indifference test. He adequately asserts that he was exposed to the substantial risk of harm of being physically tossed about in an erratic vehicle and that Diming was aware of that risk and disregarded it by failing to take any preventative measures.

b.

The only remaining question is whether Mr. Thompson's right to reasonable protection from a known threat was clearly established as of April 8, 2010, the date of the incident. As before, we first look to controlling authority in the relevant jurisdiction, specifically cases from the Supreme Court, this Court of Appeals, or the highest court of the state in which the action arose. *Owens*, 372 F.3d at 279. We conclude that Mr. Thompson's right was clearly established.

*Odom* held that, by June 2000, it was clearly established in the Fourth Circuit that "a correctional officer who stands by as a passive observer and takes no action whatsoever to intervene during an assault violates the rights of the victim inmate." 349 F.3d at 773 (denying qualified immunity). Reasonable officials would understand *Odom* to mean that inmates have an Eighth Amendment right to be protected from malicious attacks, not just by other inmates, but also from the very officials tasked with ensuring their security. *See Hope*, 536 U.S. at 739 ("[C]ontours [of the right] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). Similarly, the Supreme Court has held that the law was "not in controversy," even in 1996, that a prison official could be liable for failing to protect a female inmate

34

from subsequent sexual assault if he were aware of a prior incident. *See Ortiz*, 562 U.S. at 189. That understanding is consistent with and buttressed by the related doctrine of bystander liability, which imposes on officers "an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers." *Randall*, 302 F.3d at 203 (2002 decision concerning actions in 2000); *see also Skrtich*, 280 F.3d at 1301 ("[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance.") (applying bystander liability to corrections officer); *Hovater*, 1 F.3d at 1068 (recognizing inmate's right to be protected from known risk of sexual assault by prison guard).

Because controlling authority clearly establishes an inmate's right to reasonable protection from malicious assault, we look no further and conclude that Mr. Thompson's right was clearly established in this case. Accordingly, we reverse the district court's grant of qualified immunity to Officer Diming.

3.

Mr. Thompson's Eighth Amendment claim also attempts to reach Lt. Thompson, Assistant Warden Jennings, and Captain Dolan. However, Mr. Thompson's appellate brief and argument do not address their liability, nor are there any facts that show how any of the three officials were aware of any risk to Mr. Thompson or how any of their actions contributed to his injuries. Accordingly, we summarily affirm the district court's grant of summary judgment in favor of these three defendants.

IV.

We now turn to Claim One, which is Mr. Thompson's First Amendment retaliation claim. He alleges that Defendants Baskerville, Jennings, Ware, Lewis, Dolan, Lt. Thompson, Seay, Blackwell, White, Cooper and Diming violated his First Amendment rights by retaliating against him before, during, and after the April 8, 2010 incident.

We summarily affirm the district court's grant of summary judgment in favor of Baskerville, Jennings, Ware, Lewis, Dolan, Lt. Thompson, Seay, Blackwell, and White because Mr. Thompson has failed to show any facts that could support an inference that the above officials were aware of his past litigation and grievances or that they acted with retaliatory intent.

However, we reverse the district court's grant of summary judgment as to Cooper and Diming because the record supports an inference that they were acting in response to Mr. Thompson being a frequent filer of grievances and litigation. In deciding to grant summary judgment, the district court relied in part on *Adams v. Rice*, 40 F.3d 72 (4th Cir. 1994). However, since the issuance of the district court's decision, this Court clarified the scope of *Adams* in *Booker*. *See* 855 F.3d at 541–42. On remand, the district court should proceed in light of this intervening authority.

V.

We now turn to Claim Three, which is Mr. Thompson's due process claim against Jennings, Dolan, Lt. Thompson, Cooper, Diming, Lewis, Seay and Blackwell. He alleges

36

that the defendants conspired to cover up the transport incident and provided a sham disciplinary hearing that was the basis for his being held in segregation.

We summarily affirm the district court's grant of summary judgment as to all defendants because administrative segregation from the general population does not implicate a protected liberty interest absent a showing of specific facts that conditions of confinement are significantly more onerous. *Incumaa v. Stirling*, 791 F.3d 517, 531 (4th Cir. 2015). Mr. Thompson's affidavits do not present specific facts demonstrating such hardship. To the extent that Mr. Thompson alleges that segregation was retaliatory punishment, that argument is better addressed under either the First or Eighth Amendment.

## VI.

We now turn to Claim Four, Mr. Thompson's supervisory liability claim against Baskerville, Jennings, Ware, Lewis, Dolan and White. The district court granted summary judgment as to all defendants. *Thompson*, 2015 WL 13065640, at *10.

We summarily affirm because Mr. Thompson only makes conclusory allegations without any specific facts that these defendants had knowledge that retaliation was taking place and that they acquiesced in the retaliatory acts. *See Randall*, 302 F.3d at 206.

## VII.

We now turn to Claims Five, Six, and Seven, which are Mr. Thompson's state law claims. All three claims are in federal court on the basis of supplemental jurisdiction.

*Thompson*, 2015 WL 13065640, at \*10. The district court declined to exercise jurisdiction and dismissed all three claims because the federal claims, which served as the anchor for the state-law claims, had already been dismissed. *Id.*

Since we reverse summary judgment as to some of the anchoring federal claims, we now reverse the district court's decision to dismiss the state law claims and remand for further proceedings.

## VIII.

For the foregoing reasons, we reverse summary judgment as to Officers Cooper and Diming on the Eighth Amendment and First Amendment claims; we reverse the district court's dismissal of the state law claims; we affirm the grant of summary judgment as to all other claims and as to all other defendants; and we remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED WITH INSTRUCTIONS*